UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

JAERUE WILLIAMS,

                         Petitioner,            **ORDER**

       -against-
                                            18 Civ. 631 (NSR) (AEK)
ANTHONY ANNUCCI,

                         Respondent.
-------------------------------------------------------------X

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.**

       The Court is currently in the process of finalizing its Report and Recommendation in this matter. While preparing the Report and Recommendation, the Court discovered that some pages of the state court transcripts related to Petitioner's underlying criminal case have not been filed on the docket. Accordingly, attached to this order are the following missing pages: (1) pages 9, 808-955, and 1112 of the trial transcript from October 2013; and (2) the entire sentencing transcript from April 1, 2014.

       The Clerk of Court is respectfully directed to mail a copy of this Order to the *pro se* Petitioner.

Dated: November 12, 2025
       White Plains, New York

                                   **SO ORDERED.**

                                   _____
                                   ANDREW E. KRAUSE
                                   United States Magistrate Judge

```
 1              THE COURT:  All right.  This is the People versus
 2      Jaerue Williams.
 3              Are the People ready?
 4              MS. CORNACHIO:  The People are ready.
 5              Julia Cornachio for the Office of the District
 6      Attorney.
 7              MS. PARRA:  Wendy Parra for the People.
 8              Good morning.
 9              THE COURT:  Good morning, counsel.
10              Is the Defendant ready?
11              MR. MC CLURE:  Yes.
12              Christopher McClure for Mr.  Williams.
13              We're ready.
14              THE COURT:  All right.  Members of the jury, I will
15      now give you some preliminary instructions to guide you in
16      your participation in this trial.
17              It will your duty to find from the evidence what
18      the facts are.  You, and you alone are the judges of the
19      facts.  You will then have to apply those facts to the law
20      as the Court gives it to you.  You must follow that law
21      whether you agree with it or not.  But nothing the Court may
22      see or do during the course of this trial should be taken by
23      you as indicating what your verdict should be.
24              The evidence from which you will find the facts
25      will consist of the testimony of witnesses, documents, and
```

Preliminary Instructions

Dr. Rothenberg - People - Cross                         808

1   fact that this hole is large, larger than typical bullets, and

2   the fact that there is fraying, indicates that this is a

3   contact.  Somewhere between a near contact.  At this range, the

4   gases that come out of the muzzle of the gun are close enough to

5   make contact with the target and then expand within the target

6   and cause the enlargement and separation of the fabric, and make

7   this large hole.

8           So, based on those observations this is contact to near

9   contact shot.

10      Q    And if the muzzle --  Withdrawn.

11          Can you tell anything about the angle of the muzzle or

12  the angle of the gun was being held to cause these holes?

13      A    To make that determination for sure, I would need test

14  firings.  In other words, known firings at different angles, and

15  then I can look at the residues on those targets and compare

16  them to my observations.

17          But the majority of the particles were below the hole.

18  This gives me an indication that there may have been a downward

19  angle, but not for sure.  There could be other reasons, but one

20  possibility is that there was a downward angle.

21          MS. CORNACHIO:  Okay.  I have nothing further, Mr.

22  Rothenberg.  Thank you very much.

23          THE COURT:  Mr.  McClure.

24          MR. MC CLURE:  Thank you, Judge.

25  CROSS EXAMINATION

1    BY MR. MC CLURE:

2        Q    Good morning, sir.

3             My name is Christopher McClure.  I'm Mr.  Williams

4    attorney.

5        A    Good morning.

6        Q    Now, gunshot residue, you said when it comes out of the

7    gun, it's like an explosion; correct?

8        A    Yes.

9        Q    So, when it sprays out of the gun, it kind of expands?

10       A    Yes.

11       Q    And lands on whatever is in close proximity; correct?

12       A    Yes.

13       Q    Is it similar to like something that we all are

14   familiar with, when powder kind of hits the floor, it kind of

15   poofs up and lands on everything?

16       A    Not quite.

17       Q    Is that fair to say?

18       A    There is more of a focus direction in gunshot residue

19   coming out of the front of the gun.  It's not unidirectional,

20   where it comes out in every direction.  It is more of a forward

21   direction in sort of a V. Shape.

22       Q    But there is also residue -- There is propellant

23   residue; correct?

24       A    Yes.

25       Q    And you said primer residue; correct?

1    A    Yes.

2    Q    Propellant comes out of the front of the gun; correct?

3    A    Yes.

4    Q    And the primer would come out of the ejection board or

5    the back of the gun; correct?

6    A    Yes.

7    Q    And the primer residue is more expansive when it comes

8    out of the gun?  It's not as directional; correct?

9    A    Yes, not as directional.  Yeah.

10    Q    But they're both gunshot residue; correct?

11    A    Yes.

12    Q    Now, you indicated that you took stubs or tape lifts of

13    the black Honda civic; correct?

14    A    I took tape lifts.

15    Q    Tape lifts?

16    A    Yes.

17    Q    And the reason you did that is because you had

18    information that the alleged shooter after the shooting got

19    right into the car?

20            MS. CORNACHIO:  Objection to right into the car.

21            THE COURT:  Sustained.

22    Q    Shortly -- He got into the car after the shooting;

23    correct?

24    A    Yes.  Some time after the shooting.

25    Q    Okay.  And so you did the tape lifts, you said, of the

Dr. Rothenberg - People - Cross                   811

1    passenger side headliner; correct?

2        A    Yes.

3        Q    The front passenger side door, interior; correct?

4        A    Yes.

5        Q    The front passenger side seat?

6        A    Yes.

7        Q    The front passenger side foot well; correct?

8        A    Yes.

9        Q    And the reason you took those, because you had

10   information that the shooter may have sat in that seat; correct?

11       A    Yes.

12       Q    Had contact -- May have had contact with the seat;

13   contact with the side passenger door?  Correct?

14       A    Or somewhere in the front.

15       Q    Somewhere in the front.  Okay.

16            So, those were the logical places for an expert like

17   yourself to take the tape lifts, because that's where more

18   likely than not if a person had gunshot residue on him, that's

19   where it would be discovered; correct?

20       A    Yes.

21       Q    And you also took tape lifts of the front driver's side

22   headliner; correct?

23       A    Yes.

24       Q    And the front driver's side door, interior; correct?

25       A    Yes.

1     Q     Front driver's side seat; correct?

2     A     Yes.

3     Q     And the front driver's side foot well; correct?

4     A     Yes.

5     Q     And the same reason?  You had information that the

6  shooter at some time after the shooting may have also sat in the

7  driver's seat; correct?

8     A     Yes.

9     Q     Okay.  And for the same reasons I just indicated.  That

10 would be the most logical place if someone had gunshot residue

11 on them, if they had contacts with those areas, that's where it

12 would be; correct?

13            MS. CORNACHIO:  Objection.  Where?

14            THE COURT:  I'm sorry.  What's the basis of the

15        objection?

16            MS. CORNACHIO:  Where.  The form of the question,

17        actually.

18            THE COURT:  Rephrase it please.

19            MR. MC CLURE:  Sure.

20     Q     The reason that you took the tape lift of the front

21 driver's seat is because if a person had gunshot residue on

22 them; particles, and sat in the driver's seat, it's likely that

23 those particles would be on the seat; right?

24            MS. CORNACHIO:  Objection.

25            THE COURT:  Overruled.

 1              THE WITNESS:  Yes.

 2      Q    The same goes with the driver's side door, interior;

 3  correct?

 4      A    Yes.

 5      Q    And the foot well; correct?  Driver's side?

 6      A    Yes.

 7      Q    Long story short, every area you did a tape lift on is

 8  because you had information that the alleged shooter may have

 9  been in close proximity or actually had contact with that

10  location; correct?

11      A    Yes.

12      Q    And those are the areas that more likely than not if

13  there was gunshot residue, that's where it would be left;

14  correct?

15      A    Yes.

16      Q    So, if a person had gunshot residue on their hands, for

17  example -- okay?

18      A    May I ask what type of gunshot residue you're referring

19  to?

20      Q    Propellant.

21      A    Propellant, okay.

22      Q    On their hands, and they touched the driver's side door

23  interior, and depending on the factors you indicated earlier

24  which we'll get into, it's likely that there would be particles

25  of gunshot residue on the driver's side door interior; correct?

Dr. Rothenberg - People - Cross                    814

1      A    There is a potential for particles to transfer.

2      Q    Now, likewise if somebody had primer residue, if

3  they're holding the gun -- Primer residue generally blows back;

4  correct?

5      A    Yes.

6      Q    If they had a primer residue on their hands and they

7  touched one of these locations, it's likely that there would be

8  gunshot residue on those locations; correct?

9           MS. CORNACHIO:  Objection.

10           THE COURT:  Overruled.

11           THE WITNESS:  Again, there is the potential for the

12      transfer to take place.

13      Q    Right.

14           And those factors -- you indicated would be first that

15  the gunshot residue would have to land on the shooter; correct?

16      A    Yes.

17      Q    And it's fair to say that the closer the shooter is to

18  the actual gunshot, the more likely that the gunshot residue

19  would be on that person?

20           MS. CORNACHIO:  Objection.

21           THE COURT:  You mean the target?

22           MR. MC CLURE:  The target; correct.

23           I'll withdraw the question and re ask it.

24           THE WITNESS:  Okay.

25      Q    You indicated that this was a close contact shot;

1    correct?

2        A    Yes.

3        Q    And isn't it true that it's more likely that they will

4    be gu shot residue you on a shooter in a close contact shot?

5        A    Perhaps no.  If the distance is so small that most of

6    the residue goes into the target.  This is the propellant

7    residue.  That there may not be propellant residue going

8    anywhere else.  It may all go into that target because it is so

9    close to that target.

10        Q    But as far as primer residue, that's a whole different

11    story; correct?

12                    MS. CORNACHIO:  Objection.

13                    THE COURT:  As to a whole different story.

14    Sustained.

15        Q    As far as primer residue, there's much more likely of a

16    chance that would be on a shooter?

17                    MS. CORNACHIO:  Objection to much more likely.

18                    MR. MC CLURE:   He's an expert.

19                    THE COURT:  Overruled.

20                    THE WITNESS:  The primer residue is more likely to

21        deposit on the shooter because it comes out of the back area

22        of the gun.

23        Q    Now, a close contact shot, isn't it true it can be up

24    to 18 inches away from the target; correct?

25                    In that range?

1     A     In this case because of the size of the hole, it would

2   probably be no more than one inch.  But we would like to have

3   the test firings to confirm that.  But in general the near

4   contact is about an inch.

5     Q     Okay.  The near contact.  But a loose contact can be up

6   to a foot away; correct?

7               MS. CORNACHIO:  Objection.

8               THE COURT:  Overruled.

9               THE WITNESS:  That -- When we start talking about a

10      foot away, we would not see the large hole.  And to make a

11      determination, the test firings would be necessary at that

12      point.

13    Q     Okay.  You testified it could be as close as an inch?

14   Somewhere in that range; correct?

15    A     Yes.

16    Q     But not actually contact; correct?

17    A     That, because there were deposits of the gun powder

18   particles, it indicated to me that not all of the material blew

19   through into the target.  There was a little space for some of

20   it to come out onto the shirt.  So, for that reason, it's

21   somewhere between the contact and the near contact.  There had

22   to be that little space for the gun powder to emerge and land on

23   the shirt.

24    Q     Okay.  Thank you.

25               So, it's fair to say the closer the shooter is to the

Dr. Rothenberg - People - Cross                          817

1    muzzle of a gun and a target, the more likely there would be

2    gunshot residue on the shooter; correct?

3        A    For the primer, yes.

4        Q    Well, obviously for the propellant also, the closer you

5    are to the muzzle of the gun, the more likely there's going to

6    be gunshot residue on you?

7        A    If you are shooting yourself.  But if the --

8        Q    But you indicated --

9             MS. CORNACHIO:  He's trying to answer.

10             THE COURT:  Let him answer.  I thought he already

11    answered that anyway.

12             You're talking about propellant?

13             MR. MC CLURE:  Yes.

14             THE WITNESS:  So, if this space between the end of

15    the gun and the target is so close, most of, if not all of

16    the propellant residue will go to the target, and there is

17    an area for it to expand and go elsewhere.

18        Q    And you indicated that to a reasonable degree of

19    scientific certainty, it was your opinion that the muzzle of the

20    gun was pointing downward; correct?

21             Meaning up to down?

22        A    It's not a definite conclusion.  Based on the fact that

23    there were numerous particles, and the majority of the

24    particles; the gun powder particles were observed below the

25    hole, that is one explanation for that pattern.

Dr. Rothenberg - People - Cross                           818

1      Q    Okay.  Now, you indicated that looking at the white

2  T-shirt, which is 58A in evidence, that it was in your opinion

3  that this was the outer most garment; correct?

4      A    Yes.

5      Q    And that the gray tank top was under the white T-shirt;

6  correct?

7      A    Yes.

8      Q    And the hole, which is --  which you circled in the

9  orange, which is right here, is on the upper left chest area;

10 correct?

11     A    Yes.

12     Q    And then there is also the hole in the shirt of the

13 gray tank top.  Likewise, you circled that which is 58B.  That's

14 also in the upper left chest area; correct?

15     A    Yes.

16     Q    Now, you went on direct examination through some

17 factors that may contribute to not recovering or observing gun

18 powder residue on the tape lifts.

19          You indicated that there might not be enough contact

20 with the vehicle; correct?

21     A    Correct.

22     Q    Obviously, if you're sitting in the seat when you are

23 touching the vehicle, that's contact; correct?

24          MS. CORNACHIO:  Objection.

25          THE COURT:  Sustained.

Dr. Rothenberg - People - Cross                      819

1      Q    If you are sitting in the seat, you're in contact with

2   that seat; correct?

3      A    Yes.

4      Q    And particles may fall off?  That's another reason;

5   correct?

6               MS. CORNACHIO:  Objection.

7               THE COURT:  I'm going to sustain the objection.

8      Q    You said another reason why they may not be recovered

9   on a object is because they may just fall off; correct?

10     A    They may fall off prior to a transfer taking place.

11     Q    Meaning fall off the alleged shooter?

12     A    Yes.

13     Q    So, it wouldn't just fall off immediately; correct?

14              MS. CORNACHIO:   Objection.

15     Q    Land on?

16              THE COURT:  Go ahead.  Finish the question.

17     Q    The gun goes off; lands on a person, and immediately

18   falls off?  That's not likely; correct?

19     A    I suppose it's not likely.

20     Q    Or they may fall off the item that was transferred --

21   that the GSR was transferred to over a period of time; correct?

22     A    Yes.

23     Q    So, obviously the closer in time that the tape lifts

24   are examined, the more likely that they didn't fall off?

25     A    Not that the tape lifts were examined, but the time

1    between the incident and when I was able to get in there and

2    collect the items.

3        Q    Yes.  Thank you.  That's what I meant.

4             From the time of the alleged incident until the time

5    you actually collected them.

6             The longer period of time, the more likely they would

7    fall off?  The shorter period of time, obviously, the converse?

8        A    Yes.  Time is a major factor.  The longer the

9    timeframe, the more likely, the more opportunities there are for

10   the material to be transferred out of what I'm looking for.

11       Q    Are there particular surfaces that are more conducive

12   to retaining gunshot residue than others?

13       A    Yes.

14       Q    And what kind of surfaces would those be?

15       A    Something that has a weave, where there are nooks and

16   crannies, where these particles become a little more embedded.

17            Something that is smooth and hard would not retain the

18   particles as long.  So, anything that is a little contoured, a

19   little rougher, something with nooks and crannies where these

20   particles can sort of kind of get wedged in, that would be

21   something more likely that it would stay longer.

22       Q    You used the term maximum flow or maximum discharge of

23   the weapon on your direct.

24            Do you recall that?

25       A    I don't believe I did.

1      Q     Referring to your report, number five, which I believe

2      is Number 56.  In part of your conclusion section, you concluded

3      that a pattern of nitrites characteristic of gunshot residue was

4      detected on white T-shirt.  This is observed when the article

5      tested was within the maximum throw for discharging of a weapon.

6                  THE COURT:  So, what's the question?

7      Q     So, the maximum throw for discharging a weapon --

8                  THE COURT:  Is that part of your conclusion?

9                  THE WITNESS:  It's in my report, yes.

10     Q     So, the maximum throw is dependent on a few factors;

11     correct?

12     A     Yes.

13     Q     One being the type of gun?  Is that fair to say?

14     A     Yes.

15     Q     Okay.  The type of ammunition; correct?

16     A     Yes.

17     Q     Maximum throw means how far the propellant comes out of

18     the front of the firearm; correct?

19     A     Yes.  That's the maximum distance that these gun powder

20     particles travel, and the maximum distance the target can be for

21     us to --  are for me to see any of those particles.

22     Q     So, clearly --  Withdrawn.

23           So, in your opinion, that the gun was within the

24     maximum throw in this case?

25     A     Yes.

Dr. Rothenberg - People - Cross                                            822

1      Q      And you can't --  You weren't able to determine what

2    the actual maximum throw of the alleged weapon in this case was;

3    correct?

4      A      Correct.

5      Q      Because you didn't have the weapon; correct?

6      A      I didn't have the test firings.

7      Q      Yes?

8      A      Which we would get in the laboratory in order to make

9    conclusions based on the powder particle patterns.

10      Q      Can you explain the difference between a tape lift and

11    a stub?

12      A      Yes.

13      Q      Please do?

14      A      A tape lift is a strip of tape that is mainly used in

15    the trace evidence section.  That's the section that I work in.

16    It is used to collect loose debris and trace evidence from

17    items.

18              A stub; it's a little stanchion, and it is made of

19    aluminum, and it has a pegget at the button and a flat top.  And

20    the top; a little sticky tab is put on it.  And the principle is

21    the same.  We use the sticky surface to collect materials or

22    evidence.  But the stub is specifically designed to fit in an

23    instrument in our laboratory.  So, the stub can be used to

24    collect materials and then be placed right into the instrument

25    and examined.

Dr. Rothenberg - People - Redirect                              823

1                    MR. MC CLURE:    One moment, Judge.   If I can have a

2        moment?

3                    I have nothing further, Judge.

4                    THE COURT:  Miss Cornachio.

5                    MS. CORNACHIO:  Briefly, Judge.

6    REDIRECT EXAMINATION

7    BY MS. CORNACHIO:

8        Q    Mr.  Rothenberg, the hypothetical --  the questions

9    that Mr.  Rothenberg -- excuse me -- Mr.  McClure was asking you

10   regarding if the shooter got in the car after the shooting you

11   would expect to find particles.

12                   Wouldn't that necessitate the fact that it had to be

13   transferred to the car or to the surface that you lifted before

14   you can answer that?

15       A    Yes.  There is always the potential for materials to

16   transfer.  In this case, it would have to be on the shooter

17   initially, and then it would have to transfer to the vehicle for

18   me to detect it in the vehicle.

19       Q    So, let's say that the particles are on the individual

20   prior to getting into the vehicle.

21                   The particles -- Would wind or elements of the

22   atmosphere effect cause those particles to dissipate prior to

23   getting into the vehicle potentially?

24       A    Yes.  That is a factor.

25       Q    How about rubbing against vegetation, such as trees or

Dr. Rothenberg - People - Redirect                              824

1    bushes?

2        A    Yes.

3        Q    How about rubbing against your own clothing?

4        A    Yes.

5        Q    How about rubbing our hands together?

6        A    Yes.

7        Q    How about rubbing your sleeve on the portion that the

8    residue would be on?

9        A    Yes.

10       Q    Okay.  So, could you describe the stability of the

11   gunshot particles?

12       A    The stability depends on all of those factors.

13       Q    Do they stick -- Do they have any stickyness to them?

14   Do they stick to the objects they touch necessarily?

15       A    They can.

16       Q    Go ahead.

17       A    These particles are hot coming out of the weapon, and

18   they can be sort of semi molten or semi melted, and stick to a

19   surface and then solidify.  So, it can be a little more stable.

20       Q    Once that transfer; that original acquisition; the

21   shooter -- the particles let's say land on the shooter, and

22   let's say they do in fact stick to the sticky --  they stick to

23   the shooter; clothing or body.  Do they always transfer to

24   another object?

25       A    I don't know.  But there is always a potential that

Dr. Rothenberg - People - Redirect                825

1    they can.

2        Q    And once they transfer, what is the -- I'm going to use

3    it again -- stickyness of it, once a secondary transfer has

4    occurred?

5              MR. MC CLURE:    Objection.

6              THE COURT:  Sustained.

7        Q    Well, can you describe the gunshot residue once the

8    secondary transfer has occurred?

9              MR. MC CLURE:    Objection.

10             THE COURT:  Sustained.

11       Q    You indicated that the material inside of the vehicle

12   on cross-examination would be a factor in the -- whether or not

13   you would -- gunshot residue would remain on a surface, if it

14   had transferred to?

15       A    Yes.

16       Q    Okay.  How about leather?

17       A    Leather is smooth and fairly hard, so it would be more

18   difficult for particulate materials, such as the gunshot powder

19   particles, to remain on a leather surface.

20       Q    And you also indicated --

21             THE COURT:  Excuse me.  The vehicle in this case is

22       leather.

23             MS. CORNACHIO:  Judge, I'm getting to that.

24             THE COURT:  Was it, Mr.  Rothenberg?  Check your

25       notes.

1          MS. CORNACHIO:  Judge, I'm getting to that.

2          THE WITNESS:  The seats in the vehicle appear to be

3    leather like in nature.

4    Q    I'm going to show you 58C.

5          Do you recognize that?

6    A    Yes.

7    Q    What is that?

8    A    This is the vehicle that I examined in the case.

9    Q    Specifically, a photograph of it.  Which portion?

10   A    This is a photograph of the interior of the vehicle

11   that I examined.

12   Q    Okay.  Is that how it appeared when you did your

13   examination?

14   A    Yes.

15         MS. CORNACHIO:  Your Honor, I offer 58C.

16         THE COURT:  Mr. McClure.

17         MR. MC CLURE:  No objection.

18         THE COURT:  We'll deem it in.

19   Q    Putting it on the monitor.

20         Mr. Rothenberg, can you describe the surfaces that

21   you -- that were tape lifted?

22   A    The seats appear leather like.

23   Q    And how does that affect potential for transfer?

24   A    The materials are less likely to remain on leather,

25   because it is smooth and harder.  So, I would see less debris on

Dr. Rothenberg - People - Redirect                    827

1    these seats.

2        Q    Now, we talked about a passage of time.  If there was a

3    seven day lapse between the time of the shooting and the time of

4    the securing of the vehicle.  Okay.  And taken out of

5    population.

6            Provided you do not know what happened to that vehicle

7    in those intervening seven days, how would that affect the

8    potential for any transfer that may have occurred to remain in

9    the vehicle?

10       A    Well, I do not --  I would not know what occurred in

11   those seven days.  But there are seven days for anything to

12   happen.  Windows can be open.  A lot of wind going through the

13   vehicle while driving.  People getting in and out.  It goes to

14   the car wash.  Seven days for other instances to take place

15   where materials can be removed from the vehicle.

16       Q    And how would -- What are the ways in which material

17   had been transferred to the vehicle could be removed just by

18   everyday -- by people coming in and out of the car and being in

19   those areas?

20       A    Anytime two surfaces come into contact, there is the

21   potential for material to be transferred from one surface to the

22   other.  This is known as low card transfer principle.  It's one

23   of the early founders of forensic science.  And simply sitting

24   in the seat, the clothing of the person sitting in the seat is

25   making contact with the seat, something can be picked up and

Dr. Rothenberg - People - Redirect                    828

1    brought out of the vehicle.  If the vehicle is vacuumed, stuff

2    can be collected.  Wind from driving fast or just even driving

3    with the windows open can make a current and those materials can

4    fly up and out.

5        Q    You mentioned -- I want to clarify you mentioned in

6    order to determine maximum throw of a weapon you would need test

7    firing.

8             That would require the actual weapon to have been test

9    fired by law enforcement to give you those test firings?

10       A    Yes.  Not only the actual weapon, but the same

11   ammunition used.  Both of those would be required for the test

12   firings.

13       Q    So, if the weapon was never recovered, you wouldn't

14   have your test firings; correct?

15            MR. MC CLURE:  Objection.

16            THE COURT:  Don't you think the jury can figure

17       that one out, Miss Cornachio.

18            MS. CORNACHIO:  Judge, that was my last question,

19       Judge.

20            THE COURT:  Sustained.

21            MS. CORNACHIO:  All right.

22            Thank you.

23            THE COURT:  Mr.  McClure.

24            MR. MC CLURE:  I'll just say I have two questions.

25       I don't want to say one.  That's the famous last words;

Proceedings                                                              829

1      right.

2    RECROSS EXAMINATION

3    BY MR. MC CLURE:

4      Q    A.D.A. Cornachio went through a lot of possibilities

5    that could happen in seven days.

6           Anything could have happened; correct?

7      A    Correct.

8      Q    To your knowledge, you don't know if any one of those

9    things actually happened; correct?

10     A    No.

11     Q    For all you know, the car could have sat there and no

12   one touched it or went in or out of it for seven days; correct?

13     A    Correct.

14     Q    That's also possible; right?

15     A    Yes.

16          MR. MC CLURE:  Nothing further.

17          THE COURT:  Thank you, Mr.  Rothenberg.

18          Okay.  Jurors, take ten.

19          Don't discuss the, folks.

20          (Whereupon, at this time People's Exhibits 58A, B.,

21   and C. were marked into evidence.)

22          (Whereupon, at this time a brief recess was taken.)

23          THE COURT:  Let's get the jury in, please.

24          THE COURT OFFICER:  Jury entering.

25          (Whereupon, at this time the sworn jurors entered

1      the courtroom, and took their respective seats.)

2              THE COURT:  Very well.  Miss Cornachio.

3              MS. CORNACHIO:  Thank you, Judge.

4              At this time, I'd like to read into the record two

5      stipulations that have been agreed by the parties.

6              Number 98, which is now in evidence.  True, Mr.

7      McClure?

8              MR. MC CLURE:   Yes.

9              MS. CORNACHIO:  It is agreed and stipulated to by

10     the parties:

11             Number one.  That People's Exhibit 87, the Yankee

12     hat, was submitted to the Westchester County Forensic

13     Laboratory on August 13th, 2012, in a sealed condition.

14             Two.  That forensic scientist, Holly O'Connor,

15     conducted D.N.A. analysis on skin like flakes recovered from

16     the inside of Yankee hat and developed a D.N.A. profile.

17             Three.  That a blood sample recovered from the body

18     of Wilfredo Rivera during the autopsy was submitted to the

19     Westchester County Forensic Laboratory on August 15th, 2012,

20     in a sealed condition.

21             Four.  That forensic scientist, Holly O'Connor,

22     developed the D.N.A. profile of Wilfredo Rivera from the

23     autopsy blood sample.

24             Five.  That Holly O'Connor compared the D.N.A.

25     profile of Wilfredo Rivera to the D.N.A. profile developed

1      from the Yankee hat.

2            Six.  That had Holly O'Connor testified at this

3      trial, she would have opined to a reasonable degree of

4      scientific certainty that the D.N.A. profile of Wilfredo

5      Rivera matches the D.N.A. profile from the Yankee hat.

6            And that is dated October 21st, 2013.  It's signed

7      by myself, Julia Cornachio, Wendy Parra, and Mr.  McClure.

8            Then Number 99.  This is also a stipulation that is

9      now in evidence.  Correct, Mr.  McClure?

10           MR. MC CLURE:    Yes.

11           MS. CORNACHIO:   Thank you.

12           That it is agreed and stipulated to by the parties:

13           One.  That a black Honda civic New York license

14     plate FWY1865 was submitted to the Westchester County

15     Forensic Laboratory on August 28th, 2012.

16           Two.  That forensic scientist, Holly O'Connor,

17     collected swabbing's from both interior and exterior of the

18     black Honda Civic, New York FWY1865.

19           Three.  That forensic scientist, Holly O'Connor,

20     tested the swabbing's for the presence of blood.

21           Four.  That Holly O'Connor --  That had Holly

22     O'Connor been called as a witness in this trial, she would

23     have testified that there was no blood detected on the

24     swabbing's collected from the black Honda civic New York

25     FYW1865.

Proceedings                                                    832

1           This also has an attachment, which is also part of

2     the stipulation regarding the areas of the vehicle that were

3     tested in this regard.  I'll read them.

4           Interior passenger side door, interior passenger

5     side seat, interior passenger side glove box and foot well,

6     interior driver's side door, interior driver's side door and

7     console, interior driver's side steering wheel and foot

8     well, exterior passenger side door handle, exterior driver's

9     side door handle, exterior passenger side top door frame,

10    exterior driver's side top door frame.

11          And the indication is that no blood was detected in

12    those samples.

13          And this stipulation was also signed by myself,

14    Julia Cornachio, Wendy Parra, and Christopher McClure.

15          Thank you, your Honor.

16          THE COURT:  Miss Parra.

17          MS. PARRA:  The People call Dr. Frank Evangelista.

18          THE COURT OFFICER:  Raise your right hand and place

19    your left hand on the bible.

20

21          D R.  F R A N K  E V A N G E L I S T A,

22    called as a witness on behalf of the People,

23    having been first duly sworn, was examined and

24    testified as follows:

25

1                    THE COURT:  Please be seated, sir.

2                    All right.  Dr., please state your full name and

3          spell your last name.

4                    THE WITNESS:  It's Frank Evangelista,

5          E-V-A-N-G-E-L-I-S-T-A.

6                    THE COURT:  Thank you.

7                    Miss Parra.

8    DIRECT EXAMINATION

9    BY MS. PARRA:

10        Q     Good morning, Dr.?

11        A     Good morning.

12        Q     Dr., by whom are you currently employed by?

13        A     For the State of Connecticut, for the Office of the

14   Chief Medical Examiner.

15        Q     What is your title there?

16        A     I'm one of the associate medical examiners.

17        Q     How long have you been an associate medical examiner

18   with Connecticut?

19        A     Since October of 2004.

20        Q     And where is your office located?

21        A     11 Shuttle Road, in Farmington Connecticut.

22        Q     Now, does that Medicine Examiner's Office handle the

23   entire state, or is it by region?

24        A     No.  The entire state of Connecticut.

25        Q     Can you tell the jury a little bit about your

Dr. Evangelista - People - Direct                          834

1    educational background?

2        A    I got a Bachelor degree in biology from Boston College

3    from 1987 to 1991.  I did four years of medical school at

4    Georgetown University, in Washington D.C., from 1992 to 1996.  I

5    did a five year combined anatomic and clinical pathology

6    residency in Beth Israel Deaconess Hospital in Boston,

7    Massachusetts, from 1996 to 2001.  And then did a one year

8    fellowship in forensic medicine at the Boston Office of the

9    Chief Medical Examiner, but the program was sponsored by Beth

10   Israel Deaconess Medical School or Hospital.  And I have a board

11   certification in anatomic, clinical and forensic pathology.

12       Q    Are you licensed to practice medicine in the State of

13   Connecticut?

14       A    Yes, I am.

15       Q    Prior to working at the Connecticut Medical Examiner's

16   Office, did you have any other employment prior to that in this

17   field?

18       A    Well, when I worked as a fellow in Boston, from 2001 to

19   2002, I did the same job there in Boston for that year, and then

20   stayed over there for a year-and-a-half, until I left in

21   September of 2004, to come down to Connecticut for October of

22   2004.

23       Q    What is forensic pathology?

24       A    Just if you look up the word forensic in the

25   dictionary, it just means how -- It's a courtroom proceeding.

1   Forensics is an argument or a courtroom argument proceeding

2   or -- I'm not a lawyer.  I mean, it's argument; courtroom

3   things.  It's how medicine; forensic medicine.  It's how

4   medicine applies to the courtroom, and I guess legal matters.

5       Q    What is pathology?

6       A    Pathology is the study of disease.  Pathos is disease

7   in Latin.  So, the study of disease.

8       Q    What are your duties and responsibilities as associate

9   medical examiner over there in Connecticut?

10      A    Well, we do autopsies and/or examinations of bodies to

11  determine either cause or manner of death for death that occurs

12  under our jurisdiction.

13      Q    And when you say for deaths that occur under your

14  jurisdiction, what does that mean?

15      A    Well, deaths -- When a death certificate is signed,

16  there is five -- There are causes of death and manners of death.

17          The manners are acts or natural, like cancer or things.

18  Like accidents, car accidents, homicides.  Any way a homicide

19  happens.  Suicides.  Once that cannot be determined, those are

20  the five manners that we -- Those are the five manners.  The

21  ones that fall under us are accidents, homicides, suicides, and

22  ones that can't be determined.

23      Q    And is that for deaths that occur within the State of

24  Connecticut?

25      A    Yes.

Dr. Evangelista - People - Direct                    836

1    Q    How many autopsies, sir, have you performed over your

2    career?

3    A    Well, I've been saying 5,000 for a while now.  It's

4    about 5,000.  Maybe a little more.

5    Q    And have you been called upon to testify as to your

6    findings regarding the autopsies that you have performed?

7    A    Yes, I have.

8    Q    Approximately, how many times would you say you've

9    testified regarding your autopsies, approximately?

10    A    It feels like a million, but probably 300, 500 times.

11        THE COURT:  Not your favorite thing, Dr.?  Is that

12    what you are staying?

13        THE WITNESS:  No.  I like doing it.  I always think

14    why don't I record -- My advice to someone doing this thing

15    is you should start recording every time you are testifying,

16    so you can have the answers.  It's hard to remember.

17    Q    During the times that you've testified, have you been

18    recognized as an expert in the field of forensic pathology?

19    A    Yes, I have.

20    Q    Have you ever been denied expertise?

21    A    No, I have not.

22        MS. PARRA:  Your Honor, at this time I would offer

23    Dr. Evangelista as an expert in the field of forensic

24    pathology.

25        MR. MC CLURE:  No objection.

Dr. Evangelista - People - Direct                    837

1              THE COURT:  The Court will recognize this witness

2      as an expert in this field.

3      Q    Dr., do you have a criminal matter pending against you

4      regarding a perjury charge that's currently going on?

5      A    In the State of Massachusetts, yes.

6      Q    And given the fact that it's pending, you are not

7      permitted to discuss the underlining facts; correct?

8      A    That's correct.

9      Q    And how long has that matter been pending now?

10     A    It feels like again a lot of years.  It's been three

11     years, two-and-a-half years.

12     Q    Have you been permitted by the Office of the Chief

13     Medical Examiner for Connecticut to keep your position as an

14     Associate Medical Examiner?

15     A    Yes.

16     Q    And have you been permitted and do you continue to

17     perform autopsies and testify in your capacity as a medical

18     examiner?

19     A    Yes.  Nothing changed, in terms of Connecticut.  My

20     role in Connecticut, nothing has changed.

21     Q    Okay.  In fact, have you testified within the last

22     three years as an Associate Medical Examiner?

23     A    Yes.  And here in New York, last year.

24     Q    Okay.  Now, Dr., I'd like to direct your attention to

25     August 12th of 2012; the morning hours.

1          Were you working in your capacity as a medical examiner

2    for the State of Connecticut?

3          A    Yes, I was.

4          Q    And on that date, did you have the occasion to perform

5    an autopsy on the body of Wilfredo Rivera?

6          A    Yes, I did.

7          Q    And what, if any, agencies were present for that

8    autopsy?

9          A    Our agency, and there was police officers from Port

10   Chester, New York.

11         Q    Now, sir, why was it that your office was charged with

12   a duty of performing the autopsy on the body of Mr. Rivera, as

13   opposed to the State of New York?

14         A    Well, he was pronounced dead in Connecticut, in

15   Greenwich Hospital, which is Connecticut.  So, it becomes our

16   jurisdiction because the death certificate would be signed here.

17   Since it's a homicide -- I mean, an autopsy that's in our

18   jurisdiction, we do the autopsy.

19         Q    Okay.

20              MS. PARRA:  And your Honor, I would ask that Dr.

21   Evangelista be permitted to look at his report in the event

22   he needs to.

23              MR. MC CLURE:  No objection.

24              MS. PARRA:  It's premarked People's 48.

25              MR. MC CLURE:   No objection.

1              THE COURT:  Dr., you don't need the permission of

2       the Court if you need to look at the notes.

3              THE WITNESS:  Okay.

4       Q     Now, Dr., was a unique number assigned to this

5       particular case?

6       A     Yes, it was.

7       Q     And what was that?

8       A     Well, as our cases -- every case that we take under our

9       jurisdiction, each case is assigned a specific number that stays

10      with that case.  So, in this case the number was assigned

11      2012-11307.

12      Q     Can you tell the jurors what was the first step as far

13      as the examination of the body of Wilfredo Rivera?

14      A     The first step is the -- getting the information from

15      the people who are calling in the death, and it's reviewed by

16      us.  And so, then the body is picked up and brought to our

17      office in Farmington.  Again, assigned a number.  When it was

18      called in, it gets assigned a number.

19             The body comes to us.  And then we, as a standard thing

20      we do for all our cases, we photograph the body as it comes from

21      the scene or from the hospital.  Whatever happens to be the

22      case.

23             The body is photographed with this case number in

24      sight; both sides of body with the clothing or the medical

25      therapy.  Then everything is removed.  The body is washed.  And

Dr. Evangelista - People - Direct                    840

1   it's photographed again, the naked body, with the same number.

2   And then an external examination is performed.

3        Q    Now, you then said you performed the external

4   examination of the body of Wilfredo Rivera.

5             Can you describe what your observations were when you

6   did that step?

7        A    Well, part of the external examination is just in

8   general we note hair color, eye color, teeth, scars, tattoos.

9   That's part of the external examination.  And height and weight

10  of the body.  Any sort of abnormalities.

11            Then we look for things that are normal and abnormal,

12  including trauma to the body, which was done in this case, and

13  everything is put into notes and diagrams, and it's part of the

14  file for the case.

15       Q    What was the height and weight that you determined for

16  Mr. Rivera's body?

17       A    Weighing approximately 209 pounds and measuring

18  approximately 71 inches in length.

19       Q    71 inches in length is?

20       A    5'11".

21       Q    What, if any, observations, Dr., did you make of any

22  injuries to the body of Wilfredo Rivera?

23       A    To start off from the top down.  He had multiple small

24  scrapes or abrasions on the face.

25       Q    Where on the face?

Dr. Evangelista - People - Direct                            841

1    A    Outer right forehead, a small one, like a quarter of an
2  inch.  Real small.
3         Three-quarters of an inch red abrasion up on the right
4  side of the face; on the upper part of the right side.
5         Three-eights of an inch, so a little under an inch
6  abrasion, under the left check.
7         And another small one on the upper aspect of the chin.
8  Like in the left side and in the lower left chin.
9         So one, two, three, four, five.  About five small
10  abrasions on both sides of the face.
11    Q    And what's an abrasion?
12    A    It's a scrape.  And that's blunt trauma.  That's when
13  something strikes the body or the body strikes something firm,
14  you get scrapes or abrasions.  Contusions are bruises or
15  lacerations or tears to the skin.
16         In this case, it was just abrasions from the blunt
17  trauma.  So, five small scrapes on the face.
18    Q    What, if any, other observations did you make of
19  injuries or trauma to the body of Wilfredo Rivera?
20    A    Well, he had an entrance gunshot wound on the left side
21  of his chest.
22    Q    And approximately, where on the chest did you observe
23  this on the left side?
24    A    Well, all I have is mid left chest.  I don't have my
25  diagrams here.  So, a photograph or diagram, I can tell you

Dr. Evangelista - People - Direct                    842

1    exactly where it is.  Mid left chest sort of means --

2        Q    Indicating?

3        A    Midline.  Like more to the midline.

4        Q    Now, did you make any observations of an exit wound?

5        A    No, there was not an exit wound.

6        Q    Can you describe --  Did you further examine the

7    entrance wound, the gunshot wound, on the body of Wilfredo

8    Rivera?

9        A    Well, it was examined, as I do all entrance gunshot

10    wounds in terms what it looked like in the diagrams; in the

11    drawings.  That was done here.

12        Q    Can you describe what your visual observations were

13    upon more closely examining the gunshot wound?

14        A    Well, it was obviously some dark, black material on the

15    skin around the wound, which is soot that comes out of the

16    barrel of the gun where the bullet is fired.

17        Q    And in addition to that, what, if any, other

18    observations could you make of the wound?

19        A    The observations -- Again there is a morphology shape

20    of the wounds when you look at to try to determine, you know,

21    entrance versus exit or range of fire for the gun.  How far away

22    the gun was from the body based on the findings of the skin or

23    the wound itself on the body.

24            And in this case, it was the black soot that was on the

25    skin and there was sort of like a contact muzzle abrasion or a

1    scrape on the edges of the wound with the black soot.

2         Q    Now, Dr., did you have that wound; the gunshot wound

3    photographed?

4         A    Yes, I did.

5         Q    Okay.  Any other observations of trauma to the body of

6    Wilfredo Rivera externally?

7         A    No.

8         Q    After your external examination, what did you move on

9    to then?

10        A    Then the internal examination is performed.

11        Q    Could you describe what, if any, observations you made

12   during your internal examination?

13        A    Well, now so there is an entrance wound on his chest.

14   So now we try to find out what's the path the wound has inside

15   the body.  What are the injuries.  And there is no exit wound,

16   so there is a bullet still in the body.  So, the bullet needs to

17   be recovered.  Everything is documented, and that's what

18   occurred in this case as well.

19        Q    Now, Dr., what observations did you make, if any, of

20   trauma or injuries internally?

21        A    Well, the entrance wound again enters the left side of

22   the chest, goes through the left rib cage, goes towards the

23   right, goes through the left lung, and then into the top of the

24   heart.  Sort of going in a downward path.  Through the left rib

25   cage, through the left lung, through the top of the heart, and

Dr. Evangelista - People - Direct                    844

1    down through the liver, and it came out the other side of the

2    liver, and the bullet sat beneath the skin on the right side of

3    the rib cage in the area over here on the right.

4         Q    And you are indicating the lower right flank?  This

5    side area?

6         A    Abdomen; flank, yeah.

7         Q    Did you recover anything during your internal

8    examination?

9         A    Yes, the bullet was recovered.

10        Q    And from the location that you just describe there?

11        A    Yes.

12        Q    Now, based on your internal examination and the

13   observations you just described, were you able to determine the

14   path of the bullet from the entrance wound to its resting spot?

15        A    Yes, I was.

16        Q    And can you tell that to the jury?

17        A    Well, just based on where it goes in and where it's

18   found, it's front to back.  So, front to back; left to right.

19   So, left to right.  And up to down.  So, front to back; left to

20   right; up to down.  The three standard dimensions for a path of

21   a wound.

22        Q    And just to clarify the up to down, are you saying that

23   the bullet went up and then it went down, or the direction is

24   downward?

25        A    Downward.

1        Q    Okay.  Dr., I'm going to show you now some photographs

2   for identification; 60A., B., C., and D.

3             Without showing them to the jury yet because they're

4   not in evidence, just take a look and see if you recognize those

5   photographs?

6        A    Yes, I do.

7        Q    And what are those photographs of, collectively?

8        A    Of the body, of the face, the chest, the wound and the

9   bullet.

10        Q    And as those items appear in those photographs, is that

11   how they appeared to you back on August 12th, 2012, when you

12   performed your autopsy?

13        A    Yes, they do.

14             MS. PARRA:  Your Honor, I would offer those series

15        of photographs, 60A. through D. Into evidence.

16             MR. MC CLURE:    No objection.

17             THE COURT:  All right.  We'll deem them in.

18             MS. PARRA:  Your Honor, with permission of the

19        Court, I'm going to display them.

20        Q    Dr., I'm going to display each photo one at a time.   I

21   just want you to describe what it shows here.

22             This it is 60A. for identification.  Can you describe

23   what we're looking at here?

24        A    Yes.  This is a standard what we call an identification

25   photograph, where the person's face or head is shown with the

Dr. Evangelista - People - Direct                    846

1    label.  This case is 2012-113307.  Standard sort of

2    identification photograph we take, as here in this case too.

3        Q    And is this commonly known as the face shot for the

4    autopsy?

5        A    I.D. photo.

6        Q    Okay.  I just want to direct your attention to this red

7    mark here, to the left of the face here, on the left eye here.

8             Well, if you're looking at the photo, the left, but

9    it's the right eye.

10            Can you describe what that is?

11       A    That's one of the abrasions I was talking about.  You

12   see it's red.  It's a scrape on the right side of the upper

13   face.

14       Q    Can you see that clearly from where you are?  Here to I

15   guess this would be the left cheek?

16       A    That again is another scrape or abrasion on the left

17   cheek.

18       Q    And those are some of the observations that you noted

19   as to the external examination?

20       A    Yes.

21       Q    And I'm now going to show you 60B. for identification.

22            What are we looking at here, Dr.?

23       A    This is a photograph of the anterior of the front of

24   the upper chest.  The label of the tag is right below the chin

25   or on the front of the neck.  And the two shoulders you can see,

Dr. Evangelista - People - Direct                    847

1    the two nipples, and there is a big black area; dark discolored

2    area.  That's the entrance of the gunshot wound on the mid left

3    chest.

4       Q    I'm going to now show you 60C. in evidence here.

5            Can you describe for the jurors what they're looking at

6    here?

7       A    This is the close-up of the entrance gunshot wound on

8    the mid left chest.

9       Q    And I'm going to zoom in a little more.

10           Can you just describe your observations that you made

11   using this photograph as to the wound itself?

12      A    The dark discoloration is black soot that's on the skin

13   around the wound, and the redness around the outside is just the

14   bleeding of the small blood vessels underneath the skin in the

15   area.

16           If you got real close, and wiped it clean, you could

17   see there is an abrasion.  You can't really see it here, but

18   there is a caul or sort of covered with a black soot.  It's hard

19   to clearly show it, but there is like an imprint abrasion

20   underneath that.

21      Q    And you indicated.  What is an imprint abrasion?

22      A    Just from the gases of the gun.  The heat of the gun;

23   the barrel when it touches the skin or close to the skin.  As

24   the bullet ignites and the projectile is coming out of the

25   barrel, gases and soot and heat is coming out of the barrel, and

Dr. Evangelista - People - Direct                          848

1    it causes the changes in the skin that you see here.

2         Q    And finally 60D. in evidence.

3              Can you describe for the jurors what they're looking at

4    here?

5         A    This is the bullet that was recovered from the right

6    lower chest on the outside.  The same case number.  Just a

7    photograph with a ruler.  And this is a standard photograph we

8    do for bullets that are recovered during autopsies.

9         Q    After you recovered the bullet and it's photographed,

10   what do you do to it?

11        A    It's handed over to the police under the standard chain

12   of custody, with signatures.  We photograph it and then it's

13   given to the police.

14        Q    Do you package the bullet in anyway prior to doing

15   that?

16        A    Yes.  It changes over the years.  But in general, you

17   take gauze and you just put gauze and put the bullet in the

18   gauze and put it in a plastic tube, and it's sealed and the

19   label is placed on the tube and given to the police department.

20        Q    I'm going to show you People's 91 in evidence.  Take a

21   look at that.

22             Dr., do you recognize what's contained in that exhibit?

23        A    Yes, I do.

24        Q    And what is it, sir?

25        A    This is the tube that I use with the gauze that I used,

Dr. Evangelista - People - Direct

1    and the label that I made for this case.  The bullet was put in

2    here and handed to the police, just like this here.

3        Q    How can you tell that's the container?

4             Is there any identifying markers on the container that

5    allow you to make that determination?

6        A    I know we have containers in our office, and I know

7    this is my label and my writing.  So, this is the standard thing

8    that I do with bullets.  So, I know this is mine or from me.

9        Q    As a result of your autopsy on the body of Wilfredo

10   Rivera, did you come to a conclusion as to the cause and manner

11   of death?

12       A    Yes, I did.

13       Q    And what was that?

14       A    It's called a gunshot wound to the chest, and the

15   manner is homicide.  Cause is gunshot wound to chest, and the

16   manner is homicide.

17       Q    Based on your observations, Dr., of the gunshot wound

18   itself, can you make any conclusions within a reasonable degree

19   of scientific certainty as to the distance that the gun was from

20   the body of Wilfredo Rivera when it was fired?

21       A    Based on the wound morphology, with the shape of the

22   wound, and the patterns on the skin, the barrel of the gun was

23   close, if not touching the skin when it was fired.

24       Q    Dr., in addition to recovering the bullet, is it the

25   custom and practice to collect samples from the body that you

Dr. Evangelista - People - Direct                    850

1    are performing an autopsy on?

2         A     Yes.

3         Q     And in this case, did you do that?

4         A     Yes, I did.

5         Q     And what did that include?

6         A     Well, there are different things that were collected

7    for different reasons.  So, I can go over each of them, if you

8    want.

9         Q     Did one of those things include --  Well, withdrawn.

10              Was a sample of blood collected during the autopsy of

11   Wilfredo Rivera?

12        A     Yes, it was.

13        Q     And what was done with that item?

14        A     Well, just in general for cases that are homicide with

15   gunshot wounds, stabbings, or whatever homicide it is, there is

16   evidence that's collected by me or by us at autopsy, which the

17   basic things are hair; some hairs, some fingernails and a tube

18   of blood.  And that's what was done in this case.  And those are

19   taken and they're labeled by me and placed in packaging.  And

20   all these things are brought down to the State Crime Lab, which

21   is in Meriden, Connecticut.

22              In this case, hair, fingernails and blood was taken and

23   sent to the lab.

24        Q     And when you did --  When you collected those samples,

25   what, if anything, did you do to protect the integrity of those

1    samples?

2        A    They are labeled with the label like here, and they're

3    placed -- It's a standard packaging.  It's all sealed.  It's all

4    evidence.  It's packaged with tape and things, and the

5    paperwork, and it's brought down by our people down to the crime

6    lab, and everything is signed over by chain of custody.  And

7    that was done here in this case.

8            MS. PARRA:  I have no other questions.  Thank you,

9        Dr.

10            THE COURT:  Mr. McClure.

11            MR. MC CLURE:  Thank you.

12   CROSS EXAMINATION

13   BY MR. MC CLURE:

14       Q    Good afternoon, Dr.

15            I'm Christopher McClure.  I'm Mr. Williams attorney.

16   I have just a few questions to follow up.

17            You indicated that in your expert opinion that the

18   firearm was close or near close contact to the wound; correct?

19       A    That's correct.

20       Q    So, it was within a matter of inches?

21            Is that fair to say, of the wound?

22       A    You know, maybe.  It might be actually just loosely

23   touching the skin.  It not like -- It's not like pressed hard

24   against the skin, because then you would have just a hole with

25   the black soot going inside.  It's on the outside.  As it's

Dr. Evangelista - People - Cross                     852

1    comes out of the fire and the heat is coming out of the barrel,

2    it deposits on the skin.

3         So, if it's really tight pushed against him, you

4    wouldn't see the same thing here.  If it's further away, the

5    soot doesn't collect on the skin.  It doesn't deposit on the

6    skin.  You get the other thing called gun powder stippling,

7    which wasn't there.

8         So, my opinion based on the black soot being there and

9    the abrasion found on the wound, this is loose or contact or

10   loose contact.  Close.  Very close.

11   Q    So, not taking the gun and sticking it in the person's

12   chest; like pushing it against him, like you said?  Otherwise,

13   you would see the ring; correct?  But close to it?

14   A    Yeah.  The soot would be inside instead of on the

15   outside.

16   Q    You didn't see any soot inside; correct?

17   A    Well, you saw the pictures.  It's there.  You know, the

18   edges were all black going inside.  So, there's a little bit,

19   but it's not all inside where there was actually like a tight

20   closure around the barrel to the skin.

21   Q    So, your expert opinion is loose, but close range of

22   fire?

23   A    That's correct.

24   Q    Now, you indicated that the path of the bullet was from

25   front to back and up to down.

1              You clarified that meaning downward?

2      A    Yes.

3      Q    So, it entered the midleft chest, as you indicated.

4   And you said you recovered it from the right side, underneath

5   the rib cage?

6      A    Yes.

7      Q    So, it would be left to right; correct?

8      A    Correct.

9      Q    And in your expert opinion, to a reasonable degree of

10  scientific certainty, is that bullet wound track consistent with

11  a gun being held at a downward angle and shooting at a downward

12  angle?

13     A    It's whatever way you can imagine.  If it goes in -- It

14  hit the ribs.  So, does that mean that it was deflected

15  downward.  You know, it's hard to say for sure.

16          You know, if he was shooting into like a soft -- You

17  know, like a block of butter, it goes straight through.  If it

18  hits a rib, it might bounce and go.  But just for the wound

19  path, again where it goes in to where it's found, that's all I

20  really can say about that.  You know, did it deflect off the rib

21  and go down, I don't know.

22     Q    Okay.  But --

23     A    I can't really say where how exactly the gun was or the

24  position of the two bodies.  Where it happened.  Any scenario

25  that you want to put together that fits that, then that's

1    possible that it happened.

2        Q    So, it is possible that wound track is consistent, in

3    your expert opinion, with being the gun being pointed down, left

4    to right?

5        A    Well, when you say consistent, that usually means

6    that's what it is.  Again, it's one of the possible ways the gun

7    could have been.  You know, if it goes straight in.  If it's

8    aiming more -- you know, not facing downward, but going cross,

9    it hits the rib and gets deflected downward, I believe that

10   could happen.  It's hard to say it was definitely pointing

11   downward.  I can't say for sure.

12       Q    But you say that is a possibility?

13       A    Yeah, it's a possibility.

14       Q    Thank you.

15            Now, you indicated that there were some abrasions on

16   the deceased face?

17       A    Yes.

18       Q    On both sides of his face; correct?

19            Is that consistent with being involved in a fight or

20   scuffle in your opinion?

21       A    It could happen that way.

22            MR. MC CLURE:  I have nothing further, Judge.

23            THE COURT:  Miss Parra.

24            MS. PARRA:  Just one question.

25   REDIRECT EXAMINATION

Det. Holzman - Hearing                                    855

1    BY MS. PARRA:

2        Q    A similar question.  The abrasions you noted to the

3    face, would that also be consistent with falling to the ground,

4    face down?

5        A    Again, it's an evidence of blunt trauma or a feature or

6    sign of blunt trauma.  In this case, a scrape or abrasion.

7    Something striking the face or the face striking something else.

8            So, a fall to the ground could do that as well.

9            MS. PARRA:  I have no other questions.

10            MR. MC CLURE:  No recross.

11            THE COURT:  Thank you, Dr.

12            (Whereupon, at this time the witness was excused

13       from the witness stand.)

14            THE COURT:  You have Detective Holzman.

15            MS. CORNACHIO:  Yes.

16            THE COURT:  Jurors, I'm going to ask you to take

17       another ten minute break.  Go on in.

18            Don't discuss the case, folks.

19            (Whereupon, at this time the sworn jurors exited

20       the courtroom.)

21            THE COURT:  Let's get Detective Holzman in, please.

22            I need the photos of the bullet that was removed

23       from the victim's body.

24            THE COURT:  Detective, raise your right hand.

25

1                D E T.   A R T H U R    H O L Z M A N,

2        called as a witness on behalf of the People,

3        having been first duly sworn, was examined and

4        testified as follows:

5

6                THE COURT:  Please be seated, Detective Holzman.

7        It's good to see you.

8                THE WITNESS:  It's nice to see you, ma'am.

9                THE COURT:  Give your full name, sir.

10               THE WITNESS:  Detective Arthur R. Holzman,

11       H-O-L-Z-M-A-N.

12               THE COURT:  I just need you to take a look at what

13       the District Attorney has handed to you.

14               MS. CORNACHIO:  Just for the record, I'm handing

15       him 93, 92A and B., which he has to open.

16               THE COURT:  And the photos that are subject to

17       connection?

18               MS. CORNACHIO:  That's 66A and B.

19               THE COURT:  All right.  Detective, I asked you here

20       ahead of time, without the jury present, because I have to

21       make a decision of whether the jurors should see those

22       photos of the defendant which show casings, I guess, in his

23       nose.

24               THE WITNESS:  Cartridges, yes.

25               THE COURT:  Cartridges on his face.

Det. Holzman - Hearing                                    857

```
1                 And you took a look at the bullet that was removed

2     from the victim's body?

3                 THE WITNESS:  Yes.

4                 THE COURT:  And that bullet, if you recall, was it

5     impaired or damaged in anyway?

6                 THE WITNESS:  Yes, it was damaged.

7                 THE COURT:  Okay.  Could you make a comparison

8     between that bullet that was removed from the victim's body

9     and what you saw on the -- the cartridges on the defendant's

10    face?

11                THE WITNESS:  They are consistent in design and

12    shape.

13                THE COURT:  What could you see from the bullet that

14    was removed from the body?

15                THE WITNESS:  That it was a .380 caliber copper

16    jacketed bullet.

17                THE COURT:  Were there any other distinctive

18    features about that bullet?

19                THE WITNESS:  Other than the shape and design.

20    That makes it consistent with it being a .380.  The weight,

21    in particular   .380 and nine-millimeter are similar in size

22    and shape.  The difference being 100 grains or smaller is

23    generally a .380.  One-hundred grains and larger is normally

24    a nine millimeter caliber bullet.

25                THE COURT:  What kind of information did those
```

1    cartridges off the defendant's face give you so you can make

2    a comparison?

3              THE WITNESS:  The bullets are both copper jacketed

4    bullets.  The cartridge casing themselves are semiautomatic

5    cartridge casings because they are in fact rimless.

6              The cartridge, if you look at the area here, it's a

7    rimless cartridge, which means it's consistent with use in a

8    semiautomatic pistol, as opposed to a rim cartridge, which

9    would be more appropriate for a revolver.

10             THE COURT:  And you saw the same kind of indicia on

11   the bullet removed from the victim's body?

12             THE WITNESS:  The bullet is actually the part on

13   the end of the cartridge itself.

14             THE COURT:  Right.  So, you didn't have obviously

15   the casing to make that comparison?

16             THE WITNESS:  Right.

17             THE COURT:  I got you.

18             Thank you.

19             MS. CORNACHIO:  I have some more.

20             THE COURT:  No.  I just needed -- The rest will

21   have to go in front of the jury.  I just needed to avoid any

22   kind of prejudice if I was going to decide or even go into

23   voir dire.

24             So, let's get the jury in please.

25             MR. MC CLURE:  I would like to address the photos

Det. Holzman - Hearing                                               859

1        themselves.

2               THE COURT:  I haven't ruled on it.  I just needed

3        to hear it out of the presence of the jury.  You can go

4        ahead and ask whatever questions you want when the offer is

5        made.

6               THE WITNESS:  Do you want these back?

7               MR. MC CLURE:  My argument for the photos is not

8        foundational.  Well, it's not a question that I think this

9        witness can answer.

10              THE COURT:  You are arguing prejudice?

11              MR. MC CLURE:   I'm arguing prejudice, and the fact

12       that the Investigator indicated there's no way possible to

13       determine the time or date when the photos were taken.  So,

14       the prejudice -- We don't know if the photos were taken a

15       year ago.  We don't if the photos were taken before or

16       after, or anytime they were taken.  They were actually

17       deleted from the phone.  They could have been deleted from

18       the phone a long time ago.

19              So, based upon that, the prejudice that would enure

20       to my client, would certainly outweigh any probative value,

21       considering that they can't even say the range of time that

22       those photos were taken.  For all know, those photos were

23       taken two years ago.

24              Based upon that, they can't -- There is no

25       probative value to them.  They're just pictures.  We don't

Det. Holzman - Hearing                                                    860

1      know where the location of those photos were.

2                  THE COURT:  What are you offering them for?

3                  MS. CORNACHIO:  Judge, we're forgetting about the

4      two cartridge casings that were recovered from the

5      defendant's residence.  Those are -- the detective is

6      prepared to state how similar in size, shape, type, material

7      caliber.

8                  THE COURT:  To what's in his nose?

9                  MS. CORNACHIO:  Yes.  To what's in his mouth.  And

10     that they're semiautomatic; consistent with .380.  And all

11     of those indicia.  That's why it's relevant as well.  It's

12     also consistent with the M.E.'s bullet.  That's how it comes

13     in.

14                 So, the fact that they were deleted two years ago

15     or when it was deleted, wouldn't matter, as far as our

16     position is concerned.

17                 The cartridges that were found at his house -- he's

18     only been staying there less than two months at the time of

19     the shooting.

20                 MR. MC CLURE:  Right.  So, if they're going to try

21     to connect those cartridges to the bullets in his mouth and

22     nose, there is no timeframe whatsoever to establish when

23     that picture was taken.

24                 THE COURT:  Well Mr. -- Look, counsel, they're

25     relevant to me, because it is a connection between him and

Det. Holzman - Hearing                                                      861

1    the bullets and the evidence in this case.

2              It doesn't matter the timing.  It doesn't.  It's up

3    to them to infer that what's on his face can be connected to

4    what's in the place where he was staying, and what was found

5    in the victim's body.

6              MR. MC CLURE:  Even if it's relevant --

7              THE COURT:  It is relevant.

8              MR. MC CLURE:  I said even if it's relevant.

9    Relevance is not the only standard.  If the probative value

10   is substantially outweighed by the prejudicial effect,

11   otherwise relevant evidence can be excluded.  I submit to

12   you that's the case.  We don't know when these photographs

13   were taken.

14             THE COURT:  Miss Cornachio made a good point the

15   other day.  If it was in his hand, it wouldn't be any issue.

16   The problem is he's got it on his face, for whatever reason.

17             MR. MC CLURE:  I don't necessarily agree with

18   that.  If they were in his hands, we wouldn't know either

19   when they were taken.

20             THE COURT:  So, you're saying under all

21   circumstances.  Well, look, the difficulty -- If you want me

22   to give them some kind of instruction, I'll take a look at

23   it.  But I think the relevance is established.

24             I was just worried, and I asked Detective Holzman

25   in because I was worried -- not that he would ever do

Det. Holzman - Hearing                                    862

1    this -- call for speculation, and he doesn't give his

2    opinions lightly, in my experience.  He's careful and

3    cautious.  But you will have a chance to inquire on

4    cross-examination.

5              Okay.

6              MS. CORNACHIO:  This is our last witness.  It's

7    quarter after.  I won't finish with my direct.  I don't what

8    you to do.  If you want me to start.  He is the last

9    witness, and then I have the other witness available for Mr.

10   McClure.

11             Do you want to start right after lunch?

12             THE COURT:  That's fine.

13             Let's ask the jury to come in.

14             THE COURT:  Detective, you can step down.

15             (Whereupon, at this time the witness was excused

16   from the witness stand.)

17             THE COURT OFFICER:  Jury entering.

18             (Whereupon, at this time the sworn jurors entered

19   the courtroom, and took their respective seats.)

20             THE COURT:  Okay.  Jurors, we're going to send you

21   out to lunch now, folks.  The People will have their last

22   witness this afternoon.  All right.  You will have a longer

23   lunch break.  We'll see you at two o'clock, everyone.

24             Don't discuss the case.

25             (Whereupon, at this time the sworn jurors exited

Det. Holzman - Hearing                                           863

1        the courtroom.)

2                THE COURT:  Let me see the photographs, please.

3                Do we really need two?

4                MS. CORNACHIO:  No.  I want the one in the mouth.

5        That's what Detective Holzman will testify to.

6                THE COURT:  All right.  So, you're only going to

7        put one of these in, assuming you can establish a foundation

8        in front of the jury on 66A.

9                MS. CORNACHIO:  Yes, Judge.  Is that the one in the

10       mouth?

11               THE COURT:  Yes.  Those are the two in the mouth.

12               MS. CORNACHIO:  I meant the picture.

13               THE COURT:  All right.  You know, if you want,

14       assuming they can lay the foundation, if you want to put

15       anything else on the record at this point, Mr.  McClure?

16       Unless you want another side-bar at that time.  Otherwise,

17       you can make whatever record you want now.

18               MR. MC CLURE:  My record has been made, Judge.  I

19       reiterate everything I just said.  I believe that -- I think

20       even those photos; just showing the black do-rag, if I'm not

21       mistaken.

22               THE COURT:  Right.

23               MR. MC CLURE:  So, he's wearing a black do-rag

24       with two bullets in his mouth.

25               THE COURT:  Look inculpatory evidence is always

1    prejudice.

2            MR. MC CLURE:  I agree with you 100 percent.  If I

3    could keep all of the prejudice evidence out, I would do it.

4    It's whether the prejudice value completely outweighs any

5    probative value.

6            THE COURT:  That's what inculpatory evidence is

7    about.

8            Look.  They'll give it the weight they deem

9    appropriate.

10           What will happen, if they can establish the

11   foundation through Detective Holzman, just renew your

12   objection, and I will overrule it.  Unless you want to have

13   another side-bar.  That's why I'm asking you now.

14           MR. MC CLURE:  I don't anticipate it.  I don't

15   know what Detective Holzman is going to say.  I don't

16   anticipate.  My objection is noted obviously, and I'll make

17   it at the time again.

18           THE COURT:  Okay.  And then just you'll state

19   you'll repeat the grounds that were urged earlier.

20           MR. MC CLURE:  Yes.

21           THE COURT:  I'll see you at two o'clock.

22           (Whereupon, at this time People's Exhibit 98 was

23   marked into evidence.)

24           (Whereupon, at this time People's Exhibit 99 was

25   marked into evidence.

1              (Whereupon, at this time People's Exhibits 60A.

2     through D. were marked into evidence.)

3              (Whereupon, at this time a luncheon recess was

4     taken.)

5

6              A F T E R N O O N   S E S S I O N

7

8              THE COURT:  Okay.  Let's get the jury in, please.

9              THE COURT OFFICER:  Jury entering.

10             (Whereupon, at this time the sworn jurors entered

11    the courtroom, and took their respective seats.)

12             THE COURT:  Good afternoon, jurors.

13             THE SWORN JURORS:  Good afternoon.

14             THE COURT:  Does anyone have anything they wish to

15    report to me?

16             Okay.  Very well.  Let's proceed, Miss Cornachio.

17             MS. CORNACHIO:  Thank you, your Honor.

18             Good afternoon.

19             THE SWORN JURORS:  Good afternoon.

20             MS. CORNACHIO:  The People call Arthur Holzman.

21             THE COURT OFFICER:  Remain standing.  Face the

22    Judge and raise your right hand and place your left hand on

23    the bible.

24

25             D E T.  A R T H U R   H O L Z M A N,

```
 1        called as a witness on behalf of the People,

 2        having been first duly sworn, was examined and

 3        testified as follows:

 4

 5                 THE COURT:  Please be seated, sir.

 6                 Please state your full name and spell your last

 7        name.

 8                 THE WITNESS:  Detective Arthur R. Holzman,

 9        H-O-L-Z-M-A-N.

10                 THE COURT:  Miss Cornachio.

11   DIRECT EXAMINATION

12   BY MS. CORNACHIO:

13        Q    Good afternoon.

14        A    Good afternoon.

15        Q    Detective, could you please tell us by whom you are

16   employed?

17        A    By the Westchester County Police Department.

18        Q    And in what capacity?

19        A    I'm Senior Firearms Examiner in the Ballistics section

20   of the Forensic Identification Unit.

21        Q    You said you are a detective as well when you gave your

22   appearance?

23        A    Yes.

24        Q    How long have you worked for the Westchester County

25   Police Department?
```

Det. Holzman - People - Direct                    867

1       A      For over 26 years.

2       Q      And other than what you're currently doing, could you

3    just tell the jury how your career went?  What you did for the

4    department?

5       A      When I first came on-the-job, so to speak, I was

6    assigned to patrol.  After that, I became the department

7    armorer, where I was responsible for the maintenance upkeep,

8    origin, testing of all the department firearms.  That includes

9    pistols, revolvers, machine guns, less than lethal weapons,

10   pepper gas launchers, tear gas, etcetera.  And then I became a

11   detective and I was assigned to the Forensic Investigation Unit.

12      Q      And when was that?

13      A      That was in 2001.

14      Q      And how long have you been the armorer?

15      A      Since '94.

16      Q      And you're currently the armorer?

17      A      Yeah, I still have that.  Unfortunately, I didn't get

18   to move on.

19      Q      And what kind of training -- Let me ask you first.

20   What are your duties and responsibilities as a Firearms and

21   Ballistics Investigator?

22      A      I'm responsible for the testing of firearms for

23   operability, as well as the classification and comparison of the

24   evidence produced by those firearms.

25      Q      And when you say the evidence produced by those

Det. Holzman - People - Direct                    868

1    firearms, what's produced?  What are you referring to?

2        A    The evidence consists of two items.  One item is the

3    bullet, which is the item that is expelled out of a firearm.

4    Travels down range, and eventually strikes a target.  As well as

5    the cartridge casing.  That in a case of a semiautomatic pistol,

6    it is normally ejected.  Or in the case of a revolver, it

7    remains in the firearm.

8        Q    You say in the case of a semiautomatic, the cartridge

9    casing normally is ejected from the firearm.

10            Can you explain?

11       A    If I could explain how a semiautomatic works.

12       Q    That would be fine.  Thank you.

13       A    A semiautomatic is the more modern of the firearms.

14   It's similar to what you see a police officer would carry on his

15   belt today.  And it consists of a magazine, which is nothing

16   more than a box with a spring.  And on top of that spring is a

17   follower.  And into this box or magazine are loaded cartridges.

18            And if I may explain what a cartridge is?

19       Q    Please do.

20       A    A cartridge is a item you load into a firearm to make

21   it ready to shoot.  It consists of the bullet, which is the item

22   that travels down range.  Expelled out of firearm, travels down

23   range and strikes a target.

24            The gun powder, which when it burns, creates the

25   pressure and pushes that bullet out of the firearm.

Det. Holzman - People - Direct                    869

1              The primer, when it's struck by a part of the firearm

2      known as a firing pin, creates a spark, ignites the gun powder

3      and pushes the bullet out.

4              And finally the cartridge casing, which is the unit

5      that holds everything today together.  You have the bullet on

6      one end; the primer on the other end; the gun powder inside.

7      And all those items together are a cartridge.

8              Now you take that cartridge, and place one on top of

9      each other into the magazine.  They're held to the top of the

10     magazine under spring pressure.  That magazine, with the

11     cartridges, is then placed into the grip of the firearm or the

12     handle of the firearm.  Then on an area on the top of the

13     firearm, known as the slide, that's drawn to the rear.  The

14     slide is normally held to the front of the firearm or held

15     forward in the firearm under heavy spring pressure.  So, you

16     overcome that spring pressure by pulling back on that slide;

17     that top cartridge pops up.  As the slide goes forward under

18     that spring pressure, it takes that cartridge off and inserts it

19     into the chamber of the firearm.

20             The chamber is nothing more than the inner most portion

21     of the barrel, and the barrel is the part where the bullet

22     travels down prior to it leaving the firearm.

23             That firearm is now ready to fire.  By pulling the

24     trigger, the primer is struck; ignites the powder, and that

25     powder creates gases and pressures, and drives that bullet out

Det. Holzman - People - Direct                    870

1    of the firearm.  That same pressure that drives the bullet out

2    of firearm also as an equal and opposite reaction to the rear.

3    That allows that slide to overcome the spring pressure and come

4    to the rear.  As it comes to the rear, it grabs that cartridge

5    casing, which is the remains of the firing of that gun.  It

6    consists of the cartridge casing, as well as the primer.  It

7    draws it to the rear and it ejects it out of the firearm.

8           Then as the slide starts to go forward again, it grabs

9    the next cartridge in the magazine; inserts it into the chamber.

10   And by continuing to pull the trigger, this gun continues to

11   fire until all the cartridges in the magazine have been

12   expended.

13      Q    Is there anything else that prevents the weapon; the

14   firearm from firing when the trigger is pulled if there is still

15   cartridges in the gun; in the weapon?

16      A    Yes.  That firearm depends on the energy of that slide

17   coming back.  The energy that's produced by that gun powder

18   creating pressure to drive the slide to the rear.  So, if

19   anything is touching the slide, or even if you didn't hold that

20   firearm firmly, it would prevent that slide from coming back far

21   enough to extract that cartridge casing.  It would cause what's

22   commonly known as a jam.

23          So, the cartridge casing would either remain completely

24   or partially within that firearm.  And barring any type of

25   mechanical intervention with that firearm, that firearm has been

Det. Holzman - People - Direct                    871

1    rendered ineffective.  So, it will only fire once.

2        Q    When you say mechanical intervention, what would you

3    have --  If that occurred --  If a jam in the weapon occurred,

4    such as you've been speaking of, how would that be cured so the

5    weapon would fire again?

6        A    On the most basic level, sometimes just by pulling the

7    slide to the rear, causes it to eject.  And then letting the

8    slide go forward, it would pick up the next cartridge.

9             In some cases the result of the slide coming back

10   partially and going forward again causes that cartridge casing

11   to bend and crimp, and now it's actually stuck in the firearm.

12   So, at that time point you have to lock the slide to the rear

13   and actually use something to pry that cartridge casing out.

14       Q    So, in a case such that you've explained, is it

15   feasible that the weapon would fire, the bullet would leave the

16   chamber; the barrel of the gun, and the cartridge casing which

17   would normally be expelled would remain in the gun?

18       A    Yes.

19       Q    Other than that circumstance where its malfunctioned or

20   it jams as you said, the cartridge casings are normally expelled

21   from the gun automatically?

22       A    Yes.  They're normally ejected upon firing the gun.

23       Q    Okay.  And how about a revolver?  Can you explain what

24   a revolver is?

25       A    The revolver is the older technology.  It's similar to

Det. Holzman - People - Direct                    872

1    what the cowboys used to carry.  It starts with a cylinder, and

2    inside that cylinder are drilled a series of holes.  These holes

3    are known as chambers.  Unlike, the semiautomatic, which only

4    has one chamber, a revolver can have as few as four chambers or

5    five chambers, and as many as nine or ten.

6              Into each one of these chambers, a cartridge is placed.

7    That cylinder is then placed into the center of the firearm, and

8    now this firearm is ready to shoot.

9              To shoot the firearm, one either cocks the hammer or

10   draws the trigger to the rear, which causes this cylinder to

11   turn until one of those live cartridges is aligned with the

12   barrel of the firearm.  The hammer falls.  And then the same

13   process in a semiautomatic occurs.  The powder burns and the

14   bullet is expelled out of the firearm.

15             To shoot this a second time, the trigger is either

16   pulled or the hammer is cocked.  The cylinder turns again until

17   the next live cartridge is aligned with the barrel.  And this

18   process is continued until all the cartridges inside that

19   cylinder are fired.

20   Q    What happens to the shell casing; cartridge casing with

21   a revolver?

22   A    They remain within the firearm.  To make that firearm

23   ready to reload, you have to remove that cylinder, individually

24   remove each cartridge casing, and then replace them with live

25   cartridges, and then is placed back into the firearm.

1    Q    Now, you said that you are in charge of -- One of your

2    duties is testing for operability of the firearms.

3         Have you tested both semiautomatic and revolvers?

4    A    Yes.

5    Q    What else have you tested?

6    A    Rifles, shotguns, machine guns.

7    Q    And approximately, how many weapons have you tested for

8    operability in your career?

9    A    The unit receives approximately 400 cases per year.

10   Each one of those cases can have one, two, three, four firearms.

11   I'm responsible for anywhere from a half to third of all those

12   cases.  So, over the course of my career literally thousands of

13   firearms I've tested.

14   Q    And you said that you test them for operability, and

15   part of your duties and responsibilities is to classify the

16   evidence that comes from them?

17   A    Yes.

18   Q    Can you explain what is involved?  How often have you

19   done that?

20   A    Again, literally thousands of times over the course of

21   my career.

22   Q    And can you explain what that means to classify the

23   evidence?

24   A    What I do is collect all the statistical information

25   about that cartridge or the evidence.  If it's a cartridge or

1    cartridge casing or a bullet, and basically what I'm doing is

2    I'm doing a visual examination and documenting all the

3    information about that piece of evidence.

4           In a case of a cartridge, I would identify the bullet,

5    the material that the cartridge casing is made out of, and

6    whether or not it has any type of plating.  The color of the

7    primer, as well as the head stamp and caliber of that cartridge.

8           In a case of a bullet, I would identify the shape, the

9    caliber, and the material that bullet is made out of.

10    Q    What is microscopic comparison?

11    A    This is when the ability exists to compare the evidence

12    to each other.  Or in the case of a firearm, the evidence to a

13    firearm.

14           When firearms are made, they start with a piece of

15    metal and they fashion it into a shape suitable for a firearm.

16    The way they do that is with machine tools, and those machine

17    tools remove and erode metal from the working surfaces of that

18    firearm.  And what I mean by the working surface is like the

19    inside of the barrel.  When they make a barrel, they take a

20    piece of steel tubing, they drill a hole through it.  Then

21    rifling is put in.

22           And if I may explain what rifling is?

23    Q    Please?

24    A    Rifling is a series of peaks and valleys that's put

25    inside the barrel and arranged in a spiral fashion.  And what

Det. Holzman - People - Direct                           875

1    the purpose of that is for, is that it gives a bullet accuracy

2    and stability as it flies through the air.

3            To give you an example, if I was to throw a football

4    with my ability, I probably couldn't hit the back door, because

5    it would flip end over end and hit the ground.  Now a

6    professional football player, we all know can throw that

7    football hundreds of yards.  And the way he does that is by

8    imparting a spin on that football and causing it to fly through

9    the air.

10           Well, it's the same thing with the bullet.  As the

11   bullet travels down the barrel, it engages those peaks and

12   valleys; causes it to spins, which gives it accuracy and

13   velocity as it exits the firearm.

14           One of the byproducts of that manufacturing process is

15   the tool that makes those lands and grooves.  Leaves microscopic

16   scratches.  And because it's a byproduct and it's a completely

17   random thing that happens.  It's not put there on purpose, but

18   it is in fact unique to that firearm.

19           So what I'm able to do, is I'm able to take that

20   bullet, look at those microscopic scratches or striations, as

21   they're known, and compare them to other bullets.  Or in the

22   case of the firearm, where I'm able to test fire that firearm

23   and recover the bullet, I'm able to look at that as well and

24   compare those marks to each other.

25           If they are in agreement, I'm then able to say that

Det. Holzman - People - Direct                 876

1    either those bullets were fired by the same firearm.  Or if I

2    had a firearm to test fire, I'm able to say that bullet was

3    fired from that firearm.

4        Q    Detective, have you testified as an expert in the field

5    of ballistic operability, comparison, and microscopic

6    comparison?

7        A    Yes, I have.

8        Q    Approximately, how many times have you been qualified

9    as an expert in that field?

10       A    Sixty times.

11       Q    And what in courts have you testified?

12       A    Local, as well as Criminal Court in Westchester County,

13   Grand Jury in Westchester County, Civil Court in Westchester

14   County, Family Court in Westchester County, the Southern

15   District State of New York Federal Court, as well as Nassau

16   County Court.

17       Q    And have you ever been denied qualification as an

18   expert in this field?

19       A    No, I have not.

20            MS. CORNACHIO:  Your Honor, I offer Detective

21   Holzman as an expert in the field of ballistics and

22   microscopic comparisons.

23            MR. MC CLURE:   No objection.

24            THE COURT:  All right.  The Court will recognize

25   this witness as an expert in that field.

Det. Holzman - People - Direct                877

1     Q      Now, where does the Westchester County Ballistics Unit

2    obtain the evidence that you then test or inspect?

3     A      Westchester County consists of 42 separate police

4    jurisdictions.  So each one of those jurisdictions submit

5    evidence to us.

6     Q      So, is it fair to say that you are in charge -- you're

7    unit is in charge of testing all the ballistic evidence for the

8    county?

9     A      Yes.

10    Q      And when this evidence is -- What type of evidence is

11    submitted to you for your consideration?

12    A      Firearms, as well as bullets and cartridge casings.

13    Q      Do you ever receive any evidence from hospital or

14    Medical Examiner's Offices?

15    A      Yes.  Both.

16    Q      What type of evidence would you receive from those

17    places?

18    A      Normally projectile or bullet evidence.

19    Q      And in what condition -- Withdrawn.

20          Do you have any protocols that you insist upon in the

21    unit to protect the integrity of the evidence that you receive?

22    A      The unit is an accredited unit.  We're accredited by

23    the State Forensics Science Commission, as well as ASCLAD Labs,

24    which is a national accrediting.  And as a result, we have to

25    follow certain criteria for the submission of evidence.  So, all

Det. Holzman - People - Direct                    878

1    of our evidence has to come in a sealed container.

2        Q    When you receive it?

3        A    Yes, when it's received.  As well as a submission sheet

4    should accompany that evidence.

5        Q    And when you are finished your examinations, what, if

6    anything, do you do with the evidence?

7        A    The evidence is again resealed.  The seals are

8    initialed by me and dated at the time that I seal that evidence.

9        Q    Now, you were talking before about loading cartridges

10   into a magazine for a semiautomatic pistol and loading

11   cartridges into a revolver?

12       A    Yes.

13       Q    Can you describe the type of ammunition that is

14   required for those weapons, as opposed to each other?

15       A    Generally, semiautomatic cartridges are known as

16   rimless in design.  And the reason for that is at the rear of

17   the cartridge casing, it's smooth.  And the reason for that is

18   because each cartridge is placed on top of each other.  So as

19   that slide strips that cartridge off the top of the magazine, if

20   there was any protrusions, it would cause that gun to jam.

21            Unlike a revolver, where the cartridge is rimmed.  And

22   the reason for that is, as I explained, we have the cylinder,

23   and inside that cylinder are chambers.  Where those chambers are

24   drilled all the way through.  So, if I was to place a rimless

25   cartridge that is appropriate for a semiautomatic into a

1    revolver, it would just drop right through.

2            So, those are two of the unique characteristics of

3    semiautomatics as well as opposed to revolver ammunition.

4            Another item is revolver ammunition can be jacketed,

5    but in most cases it's just a pure led bullet.  And the reason

6    for that led is; A., it's soft; and B., because of the weight,

7    it maintains the velocity for its travel through the air.

8            Now, semiautomatic bullets are normally jacketed.  And

9    the reason that they jacket it, and if I can explain what a

10   jacketed bullet is.

11   Q    I was going to ask you to, yes?

12   A    What a jacketed bullet is, the easiest way to describe

13   it is it's like a M. & M.  The led that is used to give that

14   bullet the weight is on the inside, and then they jacket it with

15   a harder metal; copper, brass, aluminum, steel.  And the reason

16   that they jacket it with these metals or gilding metals as

17   they're known, is to give toughness to that bullet.  Unlike the

18   revolver, where the cartridges are just placed in a cylinder,

19   that semiautomatic, the mechanism of that firearm, takes that

20   cartridge and places it into the chamber.  So, it's bouncing

21   around inside before it actually gets into the chamber.

22           So, it's important to give a little bit of toughness to

23   that bullet.  If it's soft led, it's going to get caught on

24   things as it's going into the chamber.  The bullets are normally

25   are very rounded, which allows them to easily find the hole at

Det. Holzman - People - Direct                            880

1    the back of the chamber.  So, this makes that bullet slightly

2    different than a revolver bullet, which in some cases is

3    actually square across the top.

4        Q    Are there different caliber semiautomatic weapons?

5        A    Yes.  Caliber is measured in two different waste.  It's

6    either measured in the metric or the standard system.  Metric,

7    you can have bullets as small as four millimeters and bullets as

8    well over 100 millimeters in diameter.  And diameter is if you

9    were to take the bullet and measure it fro one side to the

10   other, as opposed to its length.

11            Now, the standard system it's measured in thousands of

12   an inch.  So, a .25 caliber firearm would be a quarter of an

13   inch.  A .50 caliber firearm would be a half an inch.

14            Now these calibers are appropriate to a particular

15   firearm.  So, a -- to give an example, a nine-millimeter and a

16   .380 are similar in diameter.  They're actually the same in

17   diameter.  The difference being the length of the cartridge.  A

18   .380 is a short nine-millimeter.  And as a result, also the

19   bullet is a lot lighter on a .380 than it is on a

20   nine-millimeter.

21       Q    Now, I'm going to direct your attention to August 14th,

22   of 2012.

23            Did there come a time that your unit; your Ballistics

24   Unit received evidence from Detective Conetta of the Port

25   Chester Police Department, involving an investigation of the

Det. Holzman - People - Direct                    881

1   shooting death of one Wilfredo Rivera?

2       A    Yes.

3       Q    What did you receive on that day?

4       A    A .380 caliber deformed copper jacketed bullet.

5       Q    And when you say bullet, which portion of the cartridge

6   are you talking about is that?

7       A    The bullet is the item again that is expelled out of

8   firearm and eventually strikes the targets.

9       Q    Where did this evidence come from?

10      A    From the Port Chester Police Department.

11      Q    Let me hand you 93 in evidence, and ask you to open it.

12  I believe it's subject to connection.  So, take a peek inside.

13  If you can open that.

14           Now, do you recognize 93 in evidence; the outside?

15      A    Yes.  This is the evidence envelope that is prepared by

16  me upon completion of my examination.  As well as the seal which

17  I just broke, and the seal that's intact, with my initials, and

18  the date that I actually sealed this evidence inside this

19  envelope.

20      Q    So, do you recognize that packaging in particular to

21  this submission?

22      A    Yes.

23      Q    Can you describe what it is?

24      A    Yes.  This is the evidence envelope that was prepared

25  by me upon completion of my examination.

Det. Holzman - People - Direct                        882

1      Q    Of when, just for the record?

2      A    Of the bullet.

3      Q    Okay.  And when you opened it up, what, if anything, do

4   you find inside?

5      A    Inside is the actual bullet that was examined by me.

6   And again, this plastic packaging was also prepared by me.  It's

7   sealed, as well as the date it was sealed, the case number and

8   my initials, as well as the item number, which I'm holding

9   upside down.  The item number.  As well as the original

10  packaging from the Port Chester Police Department that the

11  bullet came in.

12     Q    You maintain all of that inside the one -- the envelope

13  that you prepare at the end?

14     A    Yes.

15     Q    Do you recognize the bullet itself?

16     A    Yes.

17     Q    How do you recognize it?

18     A    It's in the container that was prepared and sealed by

19  me, as well as it is a .380 caliber deformed copper jacketed

20  bullet.

21              MS. CORNACHIO:  I offer in as much as the

22        connection be completed, I offer 93 completely into

23        evidence.

24              THE COURT:  Mr. McClure.

25              MR. MC CLURE:  No objection.

1           THE COURT:  All right.  We'll deemed it in.  It's

2      connected.

3      Q      What did you do with People's 93 when you got it?

4      A      I performed an examination on it.  Which in the case of

5      only one bullet, there was no microscopic comparison done,

6      because there is nothing to compare it with.

7           But I did collect all the statistical information about

8      it.  The caliber, the make or the material that it's made out

9      of, as well as the lands and grooves that were engraved on the

10     side of that bullet, and whether they twist to the right or to

11     the left, and how many there actually are on that bullet.

12     Q      And what kind of a bullet -- What is the caliber of the

13     bullet?

14     A      The bullet is .380 caliber.

15     Q      And what type of weapon is a .380 caliber associated

16     with?

17     A      Normally a .380 automatic caliber firearm.

18     Q      And what is the material of this bullet?

19     A      The bullet is copper jacketed on the outside, as well

20     as led inside.

21     Q      And when you say copper jacketed, that's what you

22     explained before about jacketing?

23     A      Yes.  This is the coating around that led that was used

24     to increase the toughness of this bullet.

25     Q      Now, what other materials are used to jacket bullets?

Det. Holzman - People - Direct                              884

1    A    There can be steel, which is a mild steel, which is

2    soft.  Aluminum, brass.  There is half-jacketed bullets.

3    They're only partially jacketed.  So, there is quite a few

4    different materials.

5    Q    You said there is something called nickle plated as

6    well?

7    A    There is actually something called cooper nickel, which

8    is an aloid between nickel and copper.  It has a white silvery

9    appearance.

10   Q    And all the different jacketing that you've just

11   described, are they visual?  Can you see the differences between

12   them with the eye?

13   A    Yes.

14        Copper, in this case, is an orangey golden color.

15   Brass is bright gold.  Aluminum is bright silver.  The steel is

16   normally either gray, or they put some type of protective

17   coating on it to prevent it from rusting, which is normally

18   either gray or a dark color.  And the cooper nickel is shiny.

19   Almost like chrome.

20        MS. CORNACHIO:  I'm just going to put this on the

21        monitor, Judge.

22   Q    Now, on August 21st of 2012, did you receive any

23   additional submissions with regard to that same shooting death

24   of Wilfredo Rivera, from Detective Conetta of the Port Chester

25   Police Department?

Det. Holzman - People - Direct                    885

```
 1     A    Yes.  Two live cartridges.
 2          And just to remind the jury, the cartridges are the
 3   items that are loaded into a firearm to make it ready to shoot.
 4          Two .380 automatic caliber live cartridges.
 5     Q    And what did you do with those?
 6     A    Again, this is nothing more than a statistical
 7   examination, because these are unfired cartridges.  So, they
 8   really serve no ballistics purpose, because there are no marks
 9   from them being fired through a firearm.
10     Q    So, you can't --  Withdrawn.
11          Take a look at 92A and 92B.
12          Do you recognize anything about those items?
13     A    Yes.  This is the original packaging that the items
14   were repackaged upon completion of the examination.
15     Q    That's how you received them?
16     A    In these paper bags, with all the information on the
17   front.
18     Q    And I'm going to ask you to open up each of those.
19          Just tell us which one you're opening first?
20     A    This is item number five.
21     Q    No.  As far as the red sticker; the evidence sticker?
22     A    92A.
23     Q    Thank you.
24     A    And the second one is 92B.  So, I'm going to open 92A
25   first.
```

Det. Holzman - People - Direct                    886

1      Q    Thank you.

2           Do you recognize 92A; both the container and the

3    contents?

4      A    Yes.

5      Q    What do you recognize them to be?

6      A    That is a .380 automatic caliber cartridge.

7      Q    Before you get to that.  One more thing.

8           Is that the evidence that you received from Port

9    Chester on that day?

10     A    Yes.

11     Q    And how do you recognize it?  The whole thing?

12     A    The evidence has my seal on it, again, when it was

13   resealed by me, as well as the original packaging.  And this

14   label was applied by my laboratory to indicate the item number

15   upon receipt.

16     Q    You're indicating the green label?

17     A    Yes, the green label on the front.

18     Q    Thank you.

19     A    And there is also one on the other packaging.

20     Q    Okay.

21          MS. CORNACHIO:  Now, I believe they've already

22     admitted into evidence.  If not, I ask they be admitted at

23     this time.

24          MR. MC CLURE:   No objection.

25          THE COURT:  All right.  We'll deem them in.

Det. Holzman - People - Direct                                887

 1      Q    Can you open 92B, please?  I'm going to ask you --

 2   Withdrawn.

 3           What are they?

 4      A    They're both .380 automatic caliber cartridges.

 5      Q    What is the difference, if any, between the two of

 6   them?

 7      A    Nothing.

 8      Q    Okay.  I'm going to ask to take one of them to put on

 9   the monitor, and you can hang onto one.

10           MS. CORNACHIO:  I'm taking B.

11           THE WITNESS:  No, that's A.

12      Q    I'm taking A.

13      A    You know what?  Do you want to take the packaging.

14           MS. CORNACHIO:  Yes, please.  Thank you.

15           I'm putting 92A on the monitor.

16      Q    Now, can you describe what 92A and 92B, as you said

17   they're identical to each other; correct?

18           MR. MC CLURE:  Objection.

19      Q    92B. and 92A, the one you have, and the one on the

20   monitor, you said they're identical to each other?

21      A    Yes.

22      Q    Can you tell us please what they are?

23      A    Looking at the monitor, to the right of the monitor,

24   that is the bullet.  That is the item that is expelled out of

25   the firearm.  The brass -- And that is the copper colored item.

Det. Holzman - People - Direct                                888

 1          The brass colored item is the cartridge casing.  And if
 2   you looked at the rear of the cartridge casing, that is the rim
 3   or the lack of a rim.  It's equal all the way across from the
 4   side of the cartridge casing to the rear of that.
 5          MS. CORNACHIO:  Can the detective come down to the
 6      monitor, so he can indicate?
 7          THE COURT:  Sure.  Okay.
 8          (Whereupon, at this time the witness complied.)
 9          MS. CORNACHIO:  Stand right there so you don't
10      block the Court or the defendant.
11          THE WITNESS:  Okay.  That, what I'm indicating is
12      actually the bullet.  That is the item that will be
13      separated from the cartridge casing upon firing that
14      cartridge, and causing it to leave the firearm.
15          The cartridge casing is the item that normally is
16      ejected from the firearm.  And by looking at the rear; the
17      rimmed area or this raised portion, this is a rimless
18      cartridge.  Meaning that it is equal all the way down, or
19      level or smooth all the way down, so that cartridge when it
20      slides on another cartridge on top of it, it doesn't catch.
21          If you were to look at a revolver cartridge, that
22      rim or that area on the back of the cartridge casing, would
23      be prominent or flanged.  It would actually stick out proud
24      from the base of that cartridge casing.
25      Q    So it would stay inside?

Det. Holzman - People - Direct                    889

1    A    So, it wouldn't drop through a cylinder on a revolver.

2    Q    What is the material of the cartridge casing?

3    A    The cartridge casing in this case is brass.

4    Q    Point to it, please?

5    A    This is the cartridge casing, and that's brass.

6    Q    Now, you said that the bullet portion is copper?

7    A    Is copper.

8    Q    And how many types of casings are there?

9    A    Again, there is a myriad of different types of casings.

10   There is copper.  There is brass.  There is aluminum.  There is

11   steel.  As well as sometimes there is a coating applied to that

12   cartridge casing.  In some cases, it's a brass cartridge casing,

13   but they apply a nickel coating, which gives it a silver

14   appearance.  It almost looks like chrome on a bumper.

15   Q    And is there any -- Is there any combination of bullets

16   to cartridge casings in the ballistic world?  In other words,

17   does there always have to be a brass casing with a copper

18   bullet?

19   A    No.  There is many possibilities.  That's how many

20   possibilities there could be.  Sometimes a steel casing with a

21   copper bullet.  It could be anything.

22          MS. CORNACHIO:  You can have a seat.  I'm not

23   promising you I won't make you come down again, though.

24   Thank you.

25          (Whereupon, at this time the witness complied.)

Det. Holzman - People - Direct                              890

1       Q     Now, did you -- Looking at both at the bullet that you

2    received originally on 14th of August --

3       A     Yes.

4       Q     -- and the evidence that you received on the 21st of

5    August; the cartridge, and the one that you have up there.

6    Could you tell us anything about comparing them to the bullet?

7       A     They are consistent with each other.  The bullet by the

8    shear weight and diameter is a .380 caliber bullet, and the

9    bullet obviously in the cartridge casing because it is actually

10   in fact marked on the base of the cartridge that is a .380

11   automatic.  They are similar.  They are similar in shape and

12   similar in design.  Meaning they're both copper jacketed, led

13   bullets.

14      Q     What type of firearm fired the bullet, People's 93 in

15   evidence?  The original bullet that you received?

16      A     A particular firearm?

17      Q     Yeah.  What type?

18      A     A semiautomatic firearm.

19      Q     Okay.  And could you tell us anymore about the type of

20   firearm?

21      A     That it has six lands and grooves, and that they twist

22   to the right.

23      Q     Could it have been -- Now, what would you need to make

24   anymore particular comparison to a firearm?

25      A     Another bullet that was fired from that same firearm or

Det. Holzman - People - Direct                                891

1    the actual firearm itself.

2       Q    Okay.  And do you have either of those things?

3       A    No, I don't.

4       Q    Is there anything turned into you at the Ballistics Lab

5    either another bullet or another firearm?

6       A    Not related to this case.

7            MS. CORNACHIO:  Thank you.

8       Q    Now 66A, which is not in evidence.  Hold it down and

9    don't let the jury see it yet.  It's only subject to connection.

10           The item that are in -- What's the number; 66A.

11           What are the items in 66A?

12      A    They are semiautomatic cartridges.

13      Q    And how can you tell that?

14      A    Because of the rimless design of the cartridge casing,

15   as well as the round copper jacketed bullet.

16      Q    When you say round copper jacketed bullet, what do you

17   mean?

18      A    If you were to look at the front of the bullet or the

19   portion that protrudes from the cartridge casing, it's rounded.

20   That's commonly known as the ogive of the bullet.  The ogive of

21   the bullet is rounded.

22      Q    And that is particular to a semiautomatic weapon?

23      A    Yes.

24      Q    So, what else can you tell us about the items that you

25   see in 66A?

Det. Holzman - People - Direct                              892

1        A     That they appear to be approximately .380 or

2    nine-millimeter caliber.

3        Q     And what --  In comparing them to the cartridge; the

4    cartridge that you have there and the one that's up here on the

5    screen.  So, that would be 92A and 92B.?

6        A     Yes.

7        Q     What, if any, comparison can you make?

8              MR. MC CLURE:  Objection.

9              Comparison to something that's not in evidence yet.

10             MS. CORNACHIO:  To what he sees in the photograph.

11             THE COURT:  I have to sustain that.

12       Q     What type of -- Is what you see in the photograph

13   consistent with what -- with 92A and 92B.?

14             MR. MC CLURE:  Objection.

15             THE COURT:  Overruled.

16       Q     You can answer that?

17       A     It's consistent with the cartridge.

18       Q     And the cartridge being 92A and 92B, that you have?

19       A     Yes.

20       Q     Why is that?

21       A     They're both of similar shape, construction and size.

22       Q     Is there anything about the other classifying visual

23   things that you can testify about?

24       A     Yes.  The materials that it's constructed of, the

25   bullet jacketing, as well as the cartridge casing material is

Det. Holzman - People - Direct                          893

1    similar.

2         Q    Explain?

3         A    The bullet jacketing is copper.  The cartridge casing

4    is brass.

5         Q    Referring to what?

6         A    What I'm looking at, as well as what's on the screen.

7              MS. CORNACHIO:  Your Honor, I offer 66A into

8         evidence at this time.

9              MR. MC CLURE:  If I may, Judge?

10             THE COURT:  Yes.

11             MR. MC CLURE:  Thank you.

12   VOIR DIRE EXAMINATION

13   BY MR. MC CLURE:

14        Q    Detective, good afternoon.

15        A    Good afternoon.

16        Q    Is there anything special about -- Withdrawn.

17             A .380 caliber bullet is common; correct?

18        A    Yes.

19             MS. CORNACHIO:  I'm sorry.  Bullet?

20             THE COURT:  Is this voir dire?

21             MR. MC CLURE:  Yes.

22             THE COURT:  Well, go ahead.

23             THE WITNESS:  Yes.

24        Q    Cartridge?

25        A    Cartridge, yes.

1       Q       What you have; what you're looking at -- okay --  is

2   there anything in particular to those .380 cartridges you're

3   looking at that make it any different than any other  .380

4   cartridge?

5                   MS. CORNACHIO:  Objection.

6                   THE COURT:  Sustained.

7       Q       Do you know --

8                   THE COURT:  It's not proper voir dire.

9       Q       Do you know when that picture was taken?

10      A       No.

11      Q       Do you know where it came from?

12                  MS. CORNACHIO:  Objection.

13                  THE COURT:  I didn't hear you.

14                  MS. CORNACHIO:  Objection.

15                  THE COURT:  Yes, sustained.  Not proper voir dire.

16                  MR. MC CLURE:  Judge, I object, as indicated

17  before.

18                  THE COURT:  Fine.  The objection is overruled.

19                  All right.  We'll deem it in.

20                  MS. CORNACHIO:  May I have it, sergeant?

21                  Okay.  I'm going to display 66A on the monitor.

22  DIRECT EXAMINATION CONTINUED

23  BY MS. CORNACHIO:

24      Q       Okay.  And I'm going to focus in on the cartridges in

25  the photo.

Det. Holzman - People - Direct                    895

1          Now, detective, can you explain to the jury now that

2    the picture is on the monitor what we're looking at?

3          A    Yes.  They are two cartridges.

4          Q    Okay.  Again, just go over it again now that we have

5    the picture in evidence?

6          A    Yes.  They are semiautomatic cartridges.  The cartridge

7    on the right, you can clearly see the lack of a rim on the base

8    of the cartridge.  The rounded bullet is brass.  I mean, the

9    rounded bullet is copper in material.  The cartridge casing or

10   the material of the cartridge casing is made out of is brass.

11              MS. CORNACHIO:  And I'm putting 92A on the monitor

12         as well.

13         Q    So, the portion -- What are the similarities between

14   92A, the object, and the cartridge that you see on 66A?

15         A    The bullet is similar, as well as the cartridge casing.

16   The bullet being the shape of the bullet, as well as the

17   material it's made out of.  And the cartridge casing.  The shape

18   of the cartridge casing, again as well as the material that

19   cartridge casing is made out of.

20         Q    Now, one final thing.  In 66, the bullet portion of the

21   cartridge; the part that's furthest most out from the mouth?

22         A    Yes.

23         Q    That's what material?

24         A    That is copper; copper jacketing.

25         Q    And what type of material was the bullet that you

Det. Holzman - People - Direct                    896

1    received in this case?

2         A    That also was copper jacketed.

3         Q    Now, did --  You said earlier that normally a shell

4    casing or I'm sorry a cartridge casing would be ejected from a

5    semiautomatic weapon?

6         A    Yes.

7         Q    Would -- And you said sometimes an interference of

8    anything on the slide; the top portion of the weapon --

9         A    Yes.

10        Q    -- could cause it to jam?

11        A    Yes.

12        Q    If the weapon were fired during a close struggle

13   between two people -- okay -- and the weapon came in contact

14   with either or both of those people, would that be a

15   circumstance that could cause the weapon after it fired the

16   bullet to jam?

17              MR. MC CLURE:  Objection.

18              THE COURT:  Overruled.

19              THE WITNESS:  The cartridge --  The slide has to

20        move freely, unimpeded by anything.  If you were to rest

21        your finger on the side of the slide while you were to fire

22        that gun, you would effect the operability of that firearm.

23              So, in a case of a struggle, depending upon if

24        someone was holding onto the gun or not holding it

25        correctly, it could impede the movement of the slide, which

1    would prevent that cartridge casing from ejected.

2    Q    Would that necessarily prevent the weapon from firing

3    the bullet originally?

4    A    No.  No.  The bullet would be expelled from the firearm

5    even if the slide didn't move.  If that slide locked forward,

6    like if somebody grabbed the slide and holding onto it, that gun

7    would still fire, but it would only fire once.  Because at that

8    point, it would be rendered inoperable until that discharge

9    cartridge casing was manually removed from that firearm.

10   Q    So, are the cartridge casings that you received from

11   Port Chester Police, 92A and B., and the cartridge casings that

12   we see in 66A, are they all consistent --  Are they all able to

13   be fired from a .380 semiautomatic weapon?

14            MR. MC CLURE:  Objection.

15            THE COURT:  One word basis for that?

16            MR. MC CLURE:   How can you tell that?  First of

17   all, leading, number one.

18            THE COURT:  Well, he's here as an expert.

19            Overruled.

20            THE WITNESS:  The live cartridges could be fired

21   from a .380 auto caliber firearm.  The cartridges in the

22   person's mouth, if they were in fact .380 caliber

23   cartridges, they could be fired.

24   Q    If they -- Can you describe the weight of a discharged

25   cartridge casing; a .380 discharge cartridge casing?

Det. Holzman - People - Cross                                         898

1       A     It's very light.  It's made out of brass.  It's hollow.

2    Less than an ounce.

3       Q     And when it is discharged from the firearm,

4    presupposing that nothing does interfere with the slide or the

5    discharged casing, which way typically does it get discharged?

6       A     Firearms are normally designed for the right-handed

7    shooter.  So, normally when you were to fire that firearm, the

8    cartridge casings ejects to the right and forward of the

9    shooter.

10      Q     And can you tell us after it's ejected, can you tell us

11   where it would land?

12            MR. MC CLURE:  Objection.

13            THE COURT:  Overruled.

14      Q     Are you able to?

15      A     Normally on the ground or --  Anything that would --

16   You know, as it comes out of the firearm, it would land on a

17   shelf or where ever it lands.  They tend to fly everywhere.

18            MS. CORNACHIO:  I have no further questions.

19            THE COURT:  Mr.  McClure.

20            MR. MC CLURE:  Yes, thank you.

21   CROSS EXAMINATION

22   BY MR. MC CLURE:

23      Q     Detective, 92A and B., which are the cartridges that

24   you received, are you able to identify a specific make of those

25   cartridges?

Det. Holzman - People - Cross

1    A    Yes.

2    Q    Manufacturer?

3         And what was that?

4    A    That was Speer.

5    Q    And 93, which is the deformed bullet --

6    A    Yes.

7    Q    -- you're not able to determine the manufacturer of the

8    deformed bullet; correct?

9    A    No.

10   Q    And there is no way to forensically link the cartridges

11   that are 92A and 92B. to the bullet which is 93; correct?

12   A    Correct.

13   Q    The only thing that you can say is that they're both

14   .380 caliber; correct?

15   A    Yes.

16   Q    Now, a .380 caliber is not a unique caliber --

17   Withdrawn.

18        A .380 caliber is a common caliber for an automatic

19   weapon; correct?

20             MS. CORNACHIO:  Objection.

21             THE COURT:  Overruled.

22             THE WITNESS:  Yes, it's a popular caliber.

23   Q    So, there is nothing --  Withdrawn.

24        Now, you indicated that when --  Withdrawn.

25        Those are semiautomatic bullets; correct, the .380's?

Det. Holzman - People - Cross                    900

1        A    Yes.

2        Q    So, they're fired from a semiautomatic firearm;

3   correct?

4        A    Yes.

5        Q    And you indicated that when the bullet is fired; when

6   the cartridge is fired, the bullet is expelled and the cartridge

7   is then expelled out of the gun; correct?

8        A    Yes, normally.

9        Q    Normally.

10            Unless it jams; correct?

11       A    Correct.

12       Q    And that the cartridge, when it's expelled typically,

13   as you indicated, would go to the right and forward of where the

14   gun is aimed; correct?

15       A    Yes.

16       Q    And it can land --  Withdrawn.

17            You said it could land anywhere.  But it doesn't have

18   unlimited distance; correct?

19       A    No.  Five, ten feet from the firearm.

20       Q    So, five, ten feet from the firearm?  Typically forward

21   and to the right; correct?

22       A    Yes.

23       Q    Now, the cartridges are made of metal; correct?

24       A    Yes.

25       Q    When a gun is fired, for lack of a better word, there

Det. Holzman - People - Cross                    901

1    is a explosion inside the chamber and the bullet is ejected out

2    of the barrel; correct?

3         A     Yes.

4         Q     There is a lot of heat; correct?

5         A     Yes.

6         Q     And the gun can actually get hot; correct?

7               The barrel of the gun?

8         A     Yeah.  After multiple shots, yes.

9         Q     And you indicated in order to -- I think you said to

10   cock a semiautomatic, you have to rack the firearm; correct?

11        A     Yes.

12        Q     You have to pull the slide back, and that puts the

13   bullet in the chamber?

14        A     Yes.

15        Q     That takes a manual movement to do; correct?  You have

16   to put your hand on it and rack it?

17        A     Yeah.  You actually have to overcome the spring

18   pressure and that spring pressure is strong enough to contain

19   the explosion of that cartridge.  It requires a substantial

20   force to pull it to the rear.

21        Q     Now, you indicated that in order --  The cartridge

22   won't eject if it's jammed in the portal -- What would you call

23   it?

24        A     The ejection port.

25        Q     That's on top of the slide; correct?

1      A    It depends on what happens to that firearm.   Depending

2  upon the circumstances, it may not even come out that far.

3      Q    So, it could just stay in the firearm and not move at

4  all?

5      A    Yeah, it's possible that.   Or the slide doesn't come

6  back far enough for it to be ejected, so the slide actually puts

7  it right back into the chamber.

8      Q    So, therefore, another bullet wouldn't load into the

9  chamber?

10     A    Correct.   It renders the firearm inoperable.

11     Q    That's one possibility.   But also the possibility is

12 what's referred to as stove pipe.   Did you ever hear that term?

13     A    Yes.   That's where the cartridge casing is partially

14 ejected.   It would be a right angle to the firearm stuck in the

15 slide.

16     Q    And you indicated that --  Well, withdrawn.

17          A cartridge jamming in a semiautomatic firearm is the

18 exception, not the rule; correct?

19              MS. CORNACHIO:   Objection.

20     Q    It doesn't happen all the time?

21     A    No.   They're designed to work.

22     Q    And you indicated that one way that it could jam is if

23 someone grabbed the top of the slide while the firearm was being

24 fired; correct?

25     A    Yes.

Det. Holzman - People - Cross

1    Q    Or something got in the way of the slide; correct?

2    A    Even clothing.  Yes.

3    Q    And as you sit here today, you can't say that a firearm

4    in this case jammed; correct?

5    A    No.

6    Q    No way of knowing?

7    A    I wasn't there.

8    Q    But as the People said to you on direct --  Withdrawn.

9         But you never received any cartridge in this case to

10   compare to the bullet; correct?

11   A    No.

12   Q    Now, you indicated that the cartridges that are 92A and

13   B., that you examined, they are copper jacketed; correct?

14   A    The bullet is copper jacketed.

15   Q    And the cartridges itself is what?

16   A    Brass.

17   Q    Brass?

18        MS. CORNACHIO:   Cartridge?

19   Q    The casing; the cartridge casing?

20   A    Yes.

21   Q    The bullet is the top and the cartridge casing is the

22   bottom.

23        MR. MC CLURE:  If I can put 92A on.  Okay.

24   Q    Can you see that?  So, the top -- I'm holding my pen --

25   that's the bullet, and the bottom, which is the casing, that's

Det. Holzman - People - Cross

1      the cartridge casing?

2      A      Yes.

3      Q      So, the top you said is copper and the bottom is brass?

4      A      Yes.

5      Q      There is nothing atypical about that combination with

6      this bullet; correct?

7      A      No.

8      Q      Probably thousands, if not millions of bullets out

9      there that have this configuration with bullet to cartridge;

10     correct?

11     A      Cartridges, yes.

12     Q      Cartridges.

13            Now, the picture, which is 66A that you looked at,

14     there is no way -- this maybe obvious, but I'm sorry I have to

15     ask it -- to forensically link what appears to be those two

16     bullets in that picture to the cartridges in 92A and B.;

17     correct?

18     A      No.

19     Q      Okay.  The most that you can say is that they look

20     similar; correct?

21     A      Yes.

22     Q      And that you believe that they --  You can't even say

23     the bullets; the cartridges in 66A are actually live rounds;

24     correct?

25     A      Correct.

1    Q    You can't even say whether they're real bullets;

2    correct?

3    A    They appear to be real bullets.  You're talking about

4    the bullet; correct?

5    Q    Whether they're capable of being fired from a gun?  You

6    can't tell that; correct?

7    A    You mean cartridges?

8    Q    Cartridges, yes.

9         The bullet --

10   A    The bullet, again, is the item that comes out of the

11   gun.

12   Q    So again, looking -- As you look at the picture, you

13   can't say those cartridges are actually even capable of being

14   fired from a firearm; correct?

15   A    No, I cannot.

16   Q    And you can't say conclusively whether they're even

17   .380's; correct?

18   A    No.

19   Q    They could be nine-millimeters; correct?

20   A    Yes.  Nine-millimeter and .380 are the same diameter.

21   The difference being the length of the cartridge itself.  So in

22   this case, I have nothing to reference the length.

23   Q    And obviously -- Not obviously.  I'll withdraw that.

24        You can't link what appears in 66A to the bullet in 93;

25   correct?

1    A    Other than the fact that they're similar in appearance,

2    no.

3    Q    Again, when we can't even say -- Can't say that 66A is

4    a .380 round -- cartridge?

5        It could be a nine-millimeter?

6        But it's a semiautomatic?

7    A    Write.  It's a semiautomatic, and it's either nine or

8    .380.

9    Q    And you don't know when 66A, that picture, was taken;

10   correct?

11   A    No.

12   Q    You don't know where that was taken; correct?

13   A    No.

14   Q    You don't know who even took the picture; correct?

15   A    I don't even know why the picture was taken.

16   Q    And other than identifying 92A and 92B, you indicated

17   there was no other ballistic value to you; correct?

18   A    Right, because they're unfired cartridges.

19        MR. MC CLURE:  One moment, if I may?

20        Nothing further, Judge.  Thank you.

21        THE COURT:  Miss Cornachio.

22        MS. CORNACHIO:  Just a couple.

23   REDIRECT EXAMINATION

24   BY MS. CORNACHIO:

25   Q    Detective, what is a .25 caliber semiautomatic

1  cartridge?

2      A     It would be a quarter of an inch or a very smaller or

3  tiny cartridge.

4      Q     Could the cartridges in 66A be .25?

5      A     No, they are much smaller than that.

6      Q     What other types of semiautomatic cartridges could

7  these not be?

8                  MR. MC CLURE:  Objection.

9                  MS. CORNACHIO:  He asked if they were.

10                 THE COURT:  Overruled.

11                 MS. CORNACHIO:  Thank you.

12                 THE WITNESS:  There is a myriad of cartridges they

13     could not be.  45 automatic.  They wouldn't be .25

14     automatic.  They wouldn't be a rifle.  They wouldn't be a

15     shotgun.

16     Q     Now, have you heard -- What is a hollow pointed bullet

17  or cartridge?

18                 MR. MC CLURE:  Objection.

19                 THE COURT:  One word basis.

20                 MR. MC CLURE:   Relevance.

21                 THE COURT:  Sustained.

22                 MS. CORNACHIO:  Judge, it will be clear in one

23     question.

24                 THE COURT:  All right.  Go ahead.

25                 THE WITNESS:  A hollow point bullet is a bullet

1    that's designed to upset upon impact with a target.  So,

2    unlike that bullet which is a round nose, full metal jacket,

3    a hollow point is actually hollow in the front.  It has a

4    hole in the front of it.  So when it strikes the target,

5    it's designed to open up or expand.

6        Q    Can you visually see a hollow pointed cartridge --

7    bullet?  Can you tell -- Visually, can you see the hollow point?

8        A    Yeah.  A hollow point has -- If you were to look at

9    that cartridge, which is the bullet, the cartridge casing, the

10   assembled unit, on the top of the bullet, there would be a hole

11   in the center of it.

12       Q    Are any of these pieces of evidence we're talking about

13   today the bullet, 93, 92A and B., the two cartridge casings, or

14   the cartridge casings that appear in 66A, are any of them hollow

15   pointed?

16       A    No, they're not.

17       Q    Would that be another similarity between the bullets --

18   between the items?

19              MR. MC CLURE:  Objection.

20              THE COURT:  Overruled.

21              THE WITNESS:  Yes, they are.

22              MS. CORNACHIO:  Thank you.

23              THE COURT:  Mr. McClure.

24              MR. MC CLURE:  Nothing, Judge.

25              THE COURT:  Thanks, Detective Holzman.

1                    (Whereupon, at this time the witness was excused

2          from the witness stand.)

3                    THE COURT:  Miss Cornachio, Miss Parra.

4                    MS. PARRA:   Your Honor, at this time the People

5          rest.

6                    THE COURT:  The People rest.

7                    All right.  You want to reserve, Mr.  McClure?

8                    MR. MC CLURE:  Yes, I'll reserve.

9                    THE COURT:  We'll talk about it.

10                    Does the defense rest?

11                    MR. MC CLURE:  No, your Honor.  We'll call a

12          witness.  Let me make sure I get his first name right.

13                    Police Officer Thomas Smith.

14                    THE COURT OFFICER:  Raise your right hand and place

15          your left hand on the bible.

16

17                    P. O.   T H O M A S   S M I T H,

18          called as a witness on behalf of the People,

19          having been first duly sworn, was examined and

20          testified as follows:

21

22                    THE COURT:  Please be seated, sir.

23                    THE WITNESS:  Thank you.

24                    THE COURT:  Please state your name.

25                    THE WITNESS:  Police Officer Thomas Smith,

P.O. Smith - Defendant - Direct                910

1        S-M-I-T-H.

2              THE COURT:  Mr.  McClure.

3    DIRECT EXAMINATION

4    BY MR. MC CLURE:

5        Q     Good afternoon, Officer Smith.

6        A     How are you?

7        Q     By whom are you currently employed by?

8        A     Village of Port Chester Police Department.

9        Q     And how long have you been employed by the Village of

10   Port Chester Police Department?

11       A     26 years.

12       Q     And in what capacity?

13       A     Patrol division.

14       Q     And can you please explain to the jury what you're

15   duties and responsibilities are in the patrol division?

16       A     Patrol division.  I patrol a certain area of the

17   village in a motorized police vehicle.  Answer calls given to me

18   over the radio, and I protect and look for crime throughout my

19   tour.

20       Q     Are part of your duties and responsibility to respond

21   to radio calls?

22       A     Yes.

23       Q     Crime scenes?

24       A     Yes.

25       Q     Interview witnesses?

1      A    Yes.

2      Q    And in your 26 years of patrolling Port Chester,

3  approximately -- I know it's been a long time.  How many

4  witnesses do you think you interviewed at crime scenes?

5              MS. CORNACHIO:  Objection.

6              THE COURT:  Sustained.

7      Q    Approximately, how many crime scenes have you responded

8  to?

9      A    Hundreds.

10     Q    And approximately, how many interviews have you

11  conducted?

12             MS. CORNACHIO:  Objection, Judge.

13             THE COURT:  Sustained.

14     Q    Are part of your duties and responsibility to speak to

15  individuals when you respond to crime scenes?

16     A    Yes.

17     Q    In those hundreds of responses to crime scenes, how

18  many individuals have you spoken to when you arrived at the

19  scenes?

20             MS. CORNACHIO:  Same objection.

21             THE COURT:  The Court is going to sustain the

22  objection.  Please.

23     Q    I'm going to draw your attention to August 11th, 2012.

24             Were you working as a capacity as a Village of port

25  Chester Police Officer on that date?

1      A    Yes, I was.

2      Q    Can you please tell the jury what your tour of duty was

3    that day?

4      A    It's called a midnight shift, but my hours are

5    different.  They're 10:30 at night until 6:30 in the morning.

6      Q    So, is it fair to say you started working on the 10th

7    at 10:30?

8      A    Yes.

9      Q    And what was your responsibility that day for that

10   shift?

11     A    Patrol.

12     Q    Okay.  Did you have a particular area that you

13   patrolled?

14     A    Yes, I do.

15     Q    What area is that?

16     A    It's called the 53 sector, and it encompasses

17   Westchester Avenue south, Boston Post Road west.  In there.  In

18   that area.

19     Q    And as of that date, August 11th, 2012, how long had

20   you been patrolling that particular area?

21     A    Probably 15 years.

22     Q    And do you regularly interact with the people that

23   reside in that area?

24     A    Yes.

25     Q    I'm going to draw your attention now to approximately

P.O. Smith - Defendant - Direct                913

1    12:18 in the morning on August 11th, 2012.

2         Okay.  Did you have occasion to respond to 16 South

3    Regent Street in Port Chester?

4    A    Yes.

5    Q    And what brought you to that location?

6    A    I was inside headquarters.  I was directed by my desk

7    sergeant that there was an apparent shooting at that location.

8    Q    Do you recall the time that you received that

9    direction?

10   A    I'd have to look at my report, but as soon as it came

11   in.

12   Q    Okay.  Would looking at your report refresh your

13   recollection?

14   A    Sure.

15   Q    As to the time?

16        MR. MC CLURE:  It's 11.  It's a two-page report.

17   It's People's 11 for identification, Judge.

18   Q    Take a look at that.  And when you are ready, let me

19   know.

20   A    Sure.  It was received at 0017.  I was standing right

21   by the desk.  I responded at 0017.

22   Q    So, when the call came in regarding a shooting, it was

23   12:17 in the morning?

24   A    Yes.

25   Q    And you responded immediately?

P.O. Smith - Defendant - Direct                    914

1      A      Immediately.

2      Q      Okay.  And you arrived at the location in a minute?

3      A      Yes.

4      Q      Please tell the jury what, if anything, you observed

5   when you arrived at 16 South Regent Street in Port Chester?

6      A      When I arrived, I observed a male Hispanic sitting on

7   the front stoop of 16 South Regent Street.

8      Q      Were you able to identify that individual?

9      A      As I approached him and spoke to him, yes, I did.

10     Q      Do you recall his name?

11     A      Sergio Aguirre.

12     Q      Sergio Aguirre?

13     A      Yeah.

14     Q      When you approached him, without saying anything that

15  he said, what did you do?

16     A      I immediately looked around.  As it came in as a

17  shooting to see if anybody was lying on the ground.  I saw to

18  the right of the front porch a baseball hat and a little area of

19  blood, and then I spoke to Mr. Aguirre.

20     Q      Did you make any observations of Mr. Aguirre himself?

21     A      Yes.

22     Q      Okay.  What, if anything, did you observe on Mr.

23  Aguirre?

24     A      He was just sitting on the front porch.

25     Q      Did you observe any blood on him or anything?

1    A    No.

2    Q    Did you have an occasion to interview Mr. Aguirre as

3    to anything he observed?

4    A    Yes.

5    Q    And what language were you speaking when you did that

6    interview?

7    A    English.

8    Q    And what language was Mr. Aguirre speaking to you back

9    in?

10   A    English.

11   Q    And when you -- when you were speaking to him, was he

12   responsive to your inquiries?

13   A    Yes.

14   Q    Did he appear, as far as you were concerned, to

15   understand what you were saying?

16   A    For the most part, yes.

17   Q    Now, when you were speaking to Mr. Aguirre, did you

18   ask him if he could recognize the individual that he saw shoot

19   somebody?

20   A    Yes.

21   Q    And what was his response to you?

22   A    He responded not his face, but he can give me a

23   physical description.

24   Q    And he gave you a physical description; correct?

25   A    Yes, he did.

P.O. Smith - Defendant - Direct                916

1    Q    And did he tell you whether he actually saw the

2  person's face?

3    A    No.

4    Q    So, he said he didn't see the person's face?

5    A    He didn't say that.  He said not his face, when I asked

6  him the question.

7    Q    So, when you asked him whether he could recognize his

8  face, he said not his face?

9    A    Not his face.

10   Q    In your mind, was there any confusion as to that

11 response?

12           MS. CORNACHIO:  Objection.

13           THE COURT:  Sustained.

14           Rephrase.

15   Q    You understood what Mr. Aguirre was saying to you?

16   A    Yes.

17   Q    And did he understand what you were saying to him?

18           MS. CORNACHIO:  Objection.

19           THE COURT:  Do you mean did he understand the

20 question he asked.

21           MR. MC CLURE:  Yes.

22   Q    Did he answer the questions appropriately that you

23 asked?

24           MS. CORNACHIO:  Objection.

25           THE COURT:  Sustained.

P.O. Smith - Defendant - Cross                    917

1      Q    Did Mr. Aguirre appear to understand the questions

2  that you asked?

3              MS. CORNACHIO:  Objection.

4              THE COURT:  Overruled.

5              THE WITNESS:  Did he appear to understand?

6      Q    Yes.

7      A    Yes.

8              MR. MC CLURE:  Nothing further, Judge.  Thank you.

9              THE COURT:  Miss Cornachio.

10             MS. CORNACHIO:  Yes.

11  CROSS EXAMINATION

12  BY MS. CORNACHIO:

13     Q    Actually, you asked Mr. Aguirre if he could recognize

14  the person who did that; correct?

15     A    Correct.

16     Q    You did not ask him if he could recognize the face?

17     A    No.

18     Q    You asked him if he could recognize the person?

19     A    Yes.

20     Q    Those were your words?

21     A    Yes.

22     Q    And his words were not the face, but he gave you a

23  description; correct?

24     A    Correct.

25     Q    Do you speak Spanish?

P.O. Smith - Defendant - Redirect                918

1      A    I understand a little bit.  I'm married to a Cuban girl

2   for 24 years.  I can kind of get along a little bit.

3      Q    And in your -- You said you are married to a Cuban

4   person?

5      A    Yes.  For 24 years, yes.

6      Q    Does -- In your experience, do you ever have occasion

7   to speak to your wife or maybe her family members, and you think

8   you're saying one thing and it turns out they understood it as

9   something different?

10              MR. MC CLURE:  Objection.

11              THE COURT:  Sustained.

12              MS. CORNACHIO:  Nothing further.  Thank you.

13              THE COURT:  Thank you.

14              MR. MC CLURE:  Just one more question.

15              THE COURT:  Yes.

16              MR. MC CLURE:  Just to clarify.

17   REDIRECT EXAMINATION

18   BY MR. MC CLURE:

19      Q    Did you ask Mr. Aguirre whether he could recognize the

20   person?

21      A    I asked him if he could recognize the person, correct.

22      Q    And his response was what?

23              MS. CORNACHIO:  Objection.

24              THE COURT:  Overruled.

25              THE WITNESS:  Not his face.

Proceedings                                    919

1      Q      Thank you.

2             THE COURT:  All right.  Thanks, Officer Smith.  You

3      are excused, sir.

4             (Whereupon, at this time the witness was excused

5      from the witness stand.)

6             THE COURT:  Mr.  McClure.

7             MR. MC CLURE:  Judge, can we -- can we have a quick

8      side-bar?

9             (Whereupon, at this time the following proceedings

10     were held at side-bar with the defendant present.)

11            THE COURT:  Mr.  McClure.

12            MR. MC CLURE:  Yes.  I discussed with Mr.  Williams

13     about his right to testify and his right not to testify.

14     Obviously, it's his right to remain silent.

15            I request if we can have some time to further

16     discuss it with him.  He's been going back and forth a

17     little bit on whether he wishes to exercise or waive his

18     right to remain silent.

19            THE COURT:  It's your right, no matter what your

20     lawyer says to you.  If you have a conflict with your

21     lawyer, you have to tell me.

22            You have an absolute right to remain silent also,

23     and I will tell the jury to draw no inference from that.

24            It's ultimately your decision whether or not you

25     wish to testify because you do have an absolute right to

 1    testify on your own behalf.

 2              Do you understand what I explained to you?

 3              THE DEFENDANT:  Yes.

 4              THE COURT:  What do you wish to do?

 5              MR. MC CLURE:  Like I said, we're not in conflict

 6    at this point and time.  He's going back and forth.  I've

 7    explained it to him.  Based on what occurred, he's kind of

 8    thinking he might want to testify.

 9              THE COURT:  Let me give the jury a break then.

10              MR. MC CLURE:  Yes, thank you.

11              (Whereupon, at this time the following proceedings

12    were held back in open court.)

13              THE COURT:  All right.  Jurors, take ten.

14              Don't discuss the case.

15              (Whereupon, at this time the sworn jurors exited

16    the courtroom.)

17              (Whereupon, at this time People's Exhibit 66A was

18    marked into evidence.)

19              (Whereupon, at this time a brief recess was taken.)

20              THE COURT:  Mr. McClure, what's it going to be?

21              MR. MC CLURE:  I discussed with Mr. Williams his

22    right in this case whether to testify or not, and the pros

23    and cons with both.  He's advised me he's electing to not

24    testify.

25              THE COURT:  That's your decision; correct?

Proceedings                                               921

1          THE DEFENDANT:  Yes.

2          THE COURT:  Okay.

3          All right.  Very well.  Let's get the jury in, and

4   then I will excuse them, and then I'll hear your motion and

5   the People's position.

6          THE COURT OFFICER:  Jury entering.

7          (Whereupon, at this time the sworn jurors entered

8   the courtroom, and took their respective seats._

9          THE COURT:  All right.  Very well.

10         Mr.  McClure.

11         MR. MC CLURE:  Your Honor, defense rests.

12         THE COURT:  Defense rests.

13         All right.  Nothing further?

14         MS. CORNACHIO:  No, your Honor.

15         THE COURT:  All right.  Very well.  Jurors, we'll

16  start again on Monday morning at 9:30.  At that time, the

17  lawyers will sum up for you and I will instruct you on the

18  law.

19         I'm going to instruct you about the rules, jurors,

20  because it's a lengthy adjournment.

21         Jurors, don't converse either among yourselves or

22  with anyone else about anything related to the case.  You

23  may tell the people with whom you live and your employer

24  that you are a juror and give them information about when

25  you will be required to be in court, but you may not talk to

1    them or anyone else about anything related to the case.

2            Do not at any time during the trial request,

3    accept, or agree to accept or discuss with any person the

4    receipt or acceptance of any payment or benefit in return

5    for supplying any information concerning the trial.

6            You must promptly report directly to me any

7    incident within your knowledge involving an attempt by any

8    person improperly to influence you or any member of the

9    jury.

10            Don't visit or view the premises or places where

11    the charged crime was allegedly committed or any other

12    premises or place involved in the case.

13            You must not use internet maps or Google earth or

14    any other program or device to search for and view any

15    location discussed in testimony.

16            Don't read, view, or listen to any accounts or

17    discussions of case reported by the media.  Don't attempt --

18    Look, we had a Journal News reporter here today.  So,

19    jurors, just if you see something in the paper, just turn

20    the page.  Or if it's on Channel 12, just change the

21    station.

22            Don't attempt to research any fact, issue or law

23    related to the case whether by discussion with others,

24    research in a library or on the internet or by any other

25    means or source.  In this age of instant electronic

1    communication and research, I want to emphasize in addition

2    to not conversing face-to-face with anyone about the case,

3    you must not communicate with anyone about the case by any

4    other means, including telephone, text message, E-mail,

5    internet chat rooms, blogs or social web sites.

6         You must not provide any information about the case

7    by any means whatsoever.  That includes the posting of

8    information about the case or what you are doing in the case

9    on any device, internet site, blog, chat room or social web

10   site.

11        You must not Google or otherwise search for any

12   information about the case or the law which applies to the

13   case or the people involved in the case, including the

14   defendant, the witnesses, the lawyers or the Judge.

15        All right.  Jurors, I shall see you Monday.  Have a

16   good long week.  9:30, folks.

17        (Whereupon, at this time the sworn jurors exited

18   the courtroom.)

19        THE COURT:  Okay.  Mr.  McClure.

20        MR. MC CLURE:  Judge, I request a trial order of

21   dismissal in this matter.

22        As to the first count of the indictment, murder in

23   the second degree, the trial evidence was not legally

24   sufficient to establish each and every element of that

25   charge sufficiently.  There is no valid line of reasoning by

1    a rational juror that could find that -- support a verdict

2    against Mr. Williams.

3            First of all, in order to have, as you know, this

4    felony murder charge, there has to be an underlining felony.

5    The underlining felony alleges is attempted robbery.  Even

6    if you credit any of the testimony to Mr. Aguirre, who he

7    states that the person that shot Willie only said is that

8    your connect.  Nothing else.  Didn't say give me your money;

9    give me your drugs.  Didn't say anything other is that your

10   connect, and I'm going to blow you.  That's it.

11           There is no underlining felony.  There is no

12   allegation.  It's clear they said that the person -- okay --

13   didn't have the gun out; wasn't pointing it at anybody;

14   threatening to take money; demanding money; demanding

15   property, or demanding anything.  Merely is that the

16   connect; is that the connect; I'm going to blow you.  That's

17   all.

18           There is no attempted robbery in the case.  There

19   is no allegation that after Mr. Rivera went to the ground,

20   he tried to take anything off his person or pick up any

21   property, or take any drugs or anything.

22           The only indication in this case that there was a

23   robbery or something happened was from Karen Jaramillo.

24   That's it.  She's the only person who said robbery.  But she

25   also says that Mr. Williams told her that he robbed her of

1    marijuana --  robbed -- I mean Mr. Rivera of marijuana.

2    But we know there was nothing taken from him, because the

3    only person that was there who says he's an eyewitness.  He

4    says that didn't happen.  It's completely contradictory.  It

5    doesn't make any sense.  Because the person that was there

6    said the only thing was said was is that your connect; is

7    that your connect; I'm going to blow.  No attempt whatsoever

8    to rob or take anything, or steal anything, or do anything

9    other than get information.

10           So, therefore, the essential element that's

11   required for the felony murder charge is robbery.  There is

12   no reasonable view of the evidence that supports that there

13   was an attempted robbery in this case.  Based upon that, the

14   People have not put forth a prima facie case and I ask a

15   directed verdict on that matter, as far as that.

16           As far as count two, count two clearly is an

17   intentional act.  I don't think there is any question about

18   that.  Okay.  Intentionally.  With intent to cause serious

19   physical injury to another caused the death of such person

20   or a third person.

21           Well, no matter who you believe or anybody you

22   believe, clearly there was no intent in this case

23   demonstrated or proven by the People.

24           In that, Mr. Aguirre says -- Again, if you credit

25   his testimony, that it wasn't until after the deceased bear

1    hugged the shooter that the gun came out and you saw his

2    hand; came out, and went off, and a pulling out motion,

3    facing down, there was a shot.  There is no allegation that

4    the trigger was even pulled.  Merely, the gun went off.

5    That's all.

6         And the medical examiner testified consistent with

7    that.  That it was a -- Shot was down.  It was a close to

8    loose contact wound.  It was from left to right.  The bullet

9    was recovered below the rib cage.  And front to back.

10   Completely consistent with what Mr.  Aguirre has said.

11        And even if you take what Miss Jaramillo said, that

12   my client said, he didn't mean to do it.  Those are the

13   words she said.

14        And mostly importantly is what Mr.  Aguirre said is

15   the shooter looked shocked after the gun went off.  Shocked.

16   And a did a little jump up and down, and ran.  I submit to

17   your Honor a person who commits an intentionally shooting

18   doesn't looked shocked when the gun goes off and someone

19   gets shocked.  It doesn't happen that way.

20        So, the People have not proven the required element

21   of the intent to cause serious physical injury.  Without

22   improving that intent, there is no reasonable fact finder,

23   even viewed in the light most favorable to the People, that

24   can find a verdict of guilty on the intent in that case.

25        Based upon that, I ask you to dismiss counts one

1      and two of the indictment.

2             Obviously, I can't in good faith make the argument

3      on count three in the indictment.  There was a gun involved

4      in this case.  I submit to you based upon that, that my only

5      argument for that could be that they haven't proved beyond a

6      reasonable doubt -- Withdrawn.  They don't need to prove

7      beyond a reasonable doubt.  Sufficient evidence that Mr.

8      Williams was the person who possessed the firearm.

9             In that, Karen Jaramillo never saw a gun.  Even if

10     you credit her testimony, never saw a gun before or after,

11     which I submit to you is impossible or improbable that

12     somebody just shut somebody around the hedge, acted shot,

13     and then ran around the hedge and somehow secreted a firearm

14     somewhere that's just been fired.  There wasn't one

15     recovered anywhere.  Obviously, the person who took it had

16     to run away with it.

17            Again, based upon that testimony alone, I submit

18     there hasn't been sufficient evidence to prove that Mr.

19     Williams even possessed a firearm, or was the person that

20     committed any of the crimes alleged in the indictment.

21            Based upon that, I ask you to dismiss all the

22     counts in the indictment.

23            THE COURT:  Who is going to handle it?

24            Miss Cornachio.

25            MS. CORNACHIO:  Yes, Judge.

Proceedings                                                928

1              The evidence put forth at the trial does show a

2     prima facie case viewed in the light most favorable to the

3     People on all three counts.

4              First the felony murder count, the robbery or

5     attempted robbery, obviously doesn't have to be a completed

6     act.  It could be either one.

7              THE COURT:  Well, what evidence supports an

8     attempted robbery?

9              MS. CORNACHIO:  I'm getting to it.

10             THE COURT:  That's what I want to hear, Miss

11    Cornachio.

12             MS. CORNACHIO:  Thank you.

13             The fact that the defendant arrives at the location

14    with a gun.  With a gun that -- Only from Sergio's

15    perspective didn't come out to that point.  We don't know

16    what Wilfredo saw that caused him to charge at the defendant

17    to prevent --

18             THE COURT:  Well, when does he say I'm going to

19    blow you?

20             MS. CORNACHIO:  He says it when's he's showing.

21             THE COURT:  That's when the bear hug happens.

22    After that.

23             MS. CORNACHIO:  Correct.  But before that, he's

24    asking if this is his connect; his connect.  The drug

25    supplier.  The person with the money.  That's the

Proceedings                                929

1     position --

2                   THE COURT:  Thinking Aguirre is the connect.

3                   MS. CORNACHIO:  Correct.  So, there is money -- If

4     there was money to be had.

5                   THE COURT:  Is there any evidence there was money

6     to be had?  Is that what this is about?

7                   What's the evidence of that.

8                   MS. CORNACHIO:  The drugs, Judge.

9                   THE COURT:  No.  What's the evidence that he had

10    intent to steal the drugs or intent to take his money?

11    Where is the evidence of that?

12                  MS. CORNACHIO:  When he comes up and he says is

13    this your connect, and we know the connect is the provider

14    of the drugs.

15                  THE COURT:  Is the distributor of the drugs?

16                  MS. CORNACHIO:  Yes.

17                  THE COURT:  The supplier?

18                  MS. CORNACHIO:  The supplier.

19                  And the fact that he said --

20                  THE COURT:  To ask where the connect is, that means

21    that's a fair inference?

22                  MS. CORNACHIO:  Yes, Judge.

23                  If this is the connect.  He's right there.  He's

24    not asking for somebody in a distance.  He's standing there,

25    and he has a gun with him, and he's indicating the gun, and

1    he's threatening that he'll blow him when he's asking him is

2    this the connect.  This is what he wants to know.

3           His words afterwards also should be considered,

4    that he says to Karen, I got him.  When she asks him what

5    happened with Willie, he says I got him.  That's enough at a

6    minimum to go to the jury as far as whether -- which she

7    says what did you get him for.  He said the marijuana.  We

8    don't know that he didn't.

9           THE COURT:  I'll tell you right now, Miss

10   Cornachio, the evidence is just not there on the attempted

11   robbery.  It is not there.  It requires such an assumption,

12   which you tried to get out from the girlfriend, but

13   couldn't, because it was --  That what this is based on,

14   it's an assumption, where is the connect.

15          MS. CORNACHIO:  It's an inference.

16          THE COURT:  It's not.  It's an inference on an

17   inference.  You don't know there was not another motive here

18   for what happened here.

19          MS. CORNACHIO:  No, Judge.

20          THE COURT:  And it's an assumption that he went

21   there to rob him, and that just because he said where is the

22   connect, doesn't mean he was looking for the drugs or the

23   money.

24          MS. CORNACHIO:  How about the fact that he actually

25   admitted to the robbery, Judge.

1          THE COURT:  It requires speculation by this jury.

2          MS. CORNACHIO:  But he admitted to the robbery.

3          THE COURT:  The compelling evidence here is when

4     the objection is sustained to the question; what did you

5     assume he was doing.  The answer is robbing him.  It's an

6     assumption.  He never says that on leaving the car.  Now he

7     may have, and she's not telling the truth, because maybe

8     she's just in a situation where it's a problem for her to

9     say if he said anything, because it also throws her into it

10    if he did.

11         But she is very clear, "Where did you believe he

12    was going?"

13              "ANSWER:  Can I answer it?

14         Yes.  Did you believe he was going to buy weed for

15    you?"

16         And again the answer is -- "Did you believe he was

17    going to buy your weed for you?"  The answer is "no".  And

18    again, but I sustained the objection.

19         Again, you are trying to get out what she believed.

20         MS. CORNACHIO:  I understand.

21         THE COURT:  All objectionable, because you don't

22    have the evidence.

23         MS. CORNACHIO:  On the phone the next day he admits

24    to her that he robbed him.  The next day.

25         THE COURT:  Where is that in the transcript?

1              MS. CORNACHIO:  I don't have the transcript, Judge.

2     I mean, I don't have it in front of me at the moment.

3              THE COURT:  But I want you to point it out to me in

4     the transcript, because this element of the crime, and if

5     it's not a prima facie.  It's certainly not beyond a

6     reasonable doubt.

7              MS. CORNACHIO:  May I?

8              THE COURT:  Finish it.  But I want to hear where

9     you're referring to the transcript.

10             MS. CORNACHIO:  Miss Parra is looking for it.

11             When Karen Jaramillo was on the stand, she was

12    asked this.  After she goes home, the next morning after she

13    finds out that Willie is dead, she calls him; asks him what

14    happened.  He says, "I got him".  She said, "what did you

15    get him for".  He said, "weed".  The weed that she had

16    ordered up.  I got him for the weed.

17             THE COURT:  We know that's in fact not the case.

18             MS. CORNACHIO:  Judge, that's not true.  We don't

19    know that at all.

20             THE COURT:  Where were the three packets found?

21             MS. CORNACHIO:  On his person.

22             THE COURT:  On whose person.

23             MS. CORNACHIO:  The deceased.  He is a dealer.  He

24    had more than three packets on him.

25             How do we know he didn't have it in his hand?  We

Proceedings                                                933

1    don't know.

2              THE COURT:  Because Sergio Aguirre was the

3    eyewitness here; right?

4              MS. CORNACHIO:  That's true.

5              THE COURT:  And he saw nothing; no exchange.

6              MS. CORNACHIO:  That's true.  That doesn't mean

7    that it didn't happen; he didn't grab from him.  They were

8    close in together.

9              THE COURT:  This requires such speculation based on

10   assumption.  This is not a connection that can be made

11   without inference on inference.  Even if I gave a

12   circumstantial evidence charge, which would have to be the

13   case on an attempted robbery, because there is absolutely no

14   direct evidence, and I don't even think it's a fair

15   inference that there was a robbery.

16             MS. CORNACHIO:  Judge, he said to Karen Jaramillo,

17   according to her testimony, that he got him.

18             THE COURT:  What page are you referring to?

19             MS. CORNACHIO:  Whether or not he was telling the

20   truth.

21             THE COURT:  Please don't talk over me.  I'm asking

22   for the page you are relying on.

23             MS. PARRA:   I'm looking for it.

24             THE COURT:  Just wait.  I'll wait.  Do you have the

25   transcript there?

1          MR. MC CLURE:  I do, Judge.  You asked me to bring

2     it, so I brought the whole thing.

3          THE COURT:  I told you to bring it.

4          Do you know the page that they're relying on?

5          MR. MC CLURE:   Off the top of my head, I don't.

6          THE COURT:  It didn't come out on direct.  It came

7     out in cross; correct?

8          MS. CORNACHIO:  No, direct.

9          Judge, the fact that --

10         THE COURT:  Please, give me the page that you're

11    relying on.

12         MS. CORNACHIO:  Page 425.

13         THE COURT:  Okay.  I'm there.

14         I've read it.  I'm not persuaded, Miss Cornachio.

15         MS. CORNACHIO:  Judge, let me finish now that you

16    read it.

17         Now he says that to her.  Whether he's telling the

18    truth or not.

19         THE COURT:  I mean, if you read the whole context

20    of this, I am not convinced at all this has anything to do

21    with an attempted robbery through her words.  And it's

22    certainly not beyond a reasonable doubt.

23         MS. CORNACHIO:  Well, Judge, we're not at this

24    stage.

25         THE COURT:  Well, the trial order of dismissal has

1    two basis; correct, Mr.   McClure?

2                    MR. MC CLURE:    Yes, Judge.

3                    MS. CORNACHIO:   Wait a second.

4                    MR. MC CLURE:    If it's not beyond a reasonable

5    doubt.

6                    THE COURT:  Well, I think it's not prima facie.

7    That's where I'm coming off of.

8                    MS. CORNACHIO:   What other inference is there to be

9    demanding --

10                   THE COURT:  There is --

11                   MS. CORNACHIO:   Can I finish making my record,

12   please?

13                   THE COURT:  Yes.

14                   MS. CORNACHIO:   Demanding if this is his connect,

15   with a weapon in hand, when he's supposedly just there to

16   buy marijuana.  He's demanding information.  He's demanding

17   if it's his connect.  He gets out of the car, when the deal

18   was supposed to be between Karen and him.  There is no

19   logical other inference then he was there to rob him.

20                   Additionally, the fact that he says that he tried

21   to rob --  that he got bud from him.  That I got him.  Not I

22   got it.  I got. him.  What does that mean to her?  It doesn't

23   mean he killed him.  It means I got bud from him.  I robbed

24   him.

25                   I mean, he's not asking to have a conversation with

1   the connect.  He's asking for the connect to get something

2   from him.

3           The question and answer is:

4           "What, if anything, did he say to you?"

5           "He said nothing.  And then he said that he just

6   got Willie".

7           What were his words?

8           He said I got Willie.  Not I got bud.  I got

9   Willie.

10          "And then what did you say?"

11          "I said okay.  For what.

12          "I said for what.  And then he said for bud.  I got

13  Willie for the bud.  I got Willie for the bud."

14          Not I got Willie and killed him.

15          "I got the bud".

16          He's claiming that he in fact stole it, which goes

17  back to his original intention when he left the car was to

18  get the bud.  Was to get the weed.  The marijuana.

19          THE COURT:  I will listen to what Mr.  McClure has

20  to say about that and how that satisfies your burden on

21  this.

22          MR. MC CLURE:  Certainly, Judge.

23          At best if the People are relying on that language,

24  it's at best equivocal "I got him for the bud".  I didn't

25  rob him of the bud.  I didn't try to take the bud.  "I got

1    the bud".  "I got him for the bud".

2         What does that mean?  It could mean a myriad of

3    different things.  It could mean for all intensive purposes

4    I got him back for the bud.  I don't know what that means.

5         THE COURT:  What are the grounds you are moving on?

6    Let's start with that.  Under the statute, tell me the

7    grounds you are moving on?

8         MR. MC CLURE:  Number one, Judge, the first ground

9    under the statute is they haven't put together a prima facie

10   case to establish each and every element of the charge.  If

11   they haven't, they can't prove it beyond a reasonable doubt.

12        There is no reasonable view of the evidence for any

13   fact finder to believe, if you credit -- even in you credit

14   all the witnesses testimony.  It's even if you credit the

15   witnesses testimony that there was no attempted robbery in

16   this case.

17        There was no allegation from the only person who

18   alleges that saw what happened.  There is no demand for

19   anything other than the connect.  Nothing.  At most --

20        THE COURT:  Just recite the statute you are relying

21   on.

22        MR. MC CLURE:  Okay.  Judge, give me a second.

23        290.10, Judge, trial order of dismissal.

24        THE COURT:  Go ahead.  What section.

25        MR. MC CLURE:  Number one is the section.  Number

```
 1      two is they lack legally sufficient evidence in support of

 2      any count of the indictment.

 3              Okay.  There is not legally sufficient evidence to

 4      support the indictment.  Okay.  So, there is one.  It can't

 5      be supported.  There is no view of the evidence that

 6      supports it, Judge.  None.  That there was a robbery or even

 7      an attempted robbery or a demand for any money.  At most --

 8      At most, maybe there was a misdemeanor menacing.  But that's

 9      not felony murder.  Misdemeanor menacing doesn't turn into

10      felony murder.

11              There is no demand for cash.  There is no demand

12      for weed.  There is actually no demand for anything except

13      is that your connect.  Not even give me the name of your

14      connect.  Is that your connect.

15              People V. Bleakley, 69 NY2d 490.  Okay.  No valid

16      line of reasoning by a rational person would support a

17      verdict against the defendant.

18              There is no valid line of reasoning.  It's an

19      inference upon inference upon an inference.  You have to

20      assume and infer, first of all, if you believe Karen

21      Jaramillo, I got him for the bud or the weed.  What that

22      means.  You have to infer -- I mean, it's a real inference;

23      it's a real leap to argue that the demand for the connect

24      was so they can rob money and weed off the connect.

25              MS. CORNACHIO:  Judge, what else did they want the
```

Proceedings                                                         939

1   connect for with a gun?  Why is he there with a gun to find

2   the connect?

3            In fact, I agree with Mr. McClure.  He's not

4   saying who is your connect.  Is this your connect.  He gets

5   out of the car with a gun to find the connect.  The only

6   reason to find the connect with a gun is to rob him, and he

7   doesn't have to say I'm going to rob him.  He doesn't have

8   to use those words.

9            MR. MC CLURE:  There are many reasons.  The only

10  reason to find the connect is to rob the person.  That is, I

11  submit, to you an extremely leap of an inference upon

12  inference.

13           THE COURT:  No.  It's not a reasonable inference.

14  What's hanging me up is this one statement about the bud,

15  because you don't know if there's bad blood.  There is a

16  different reason.  And it's not a reasonable inference, that

17  it's just the attempted robbery.

18           It's an assumption.  Miss Cornachio, you brought it

19  so clearly out on your direct that she was assuming it,

20  because he never said a single word to her upon leaving the

21  car and getting back in the car.  What we find is when she

22  visits him in the jail, that's when he makes the statement

23  that he got Willie for the bud.

24           MS. CORNACHIO:  No.  That's the next morning.  425

25  is the next morning.  Look at the page before.  It's the

1    next morning.  When she finds out he's dead, that very

2    morning, the same morning actually, she calls him and asks

3    him what happened.  He says, "I got him".  Not for the bud.

4    He says, "I got Willie".  She asks him, "what did you get

5    him for"?

6           THE COURT:  In other words, page 425 is being said

7    at the next day.

8           MS. CORNACHIO:  Yes.  Look at the page before, it

9    says the same morning.  It's later in the morning after she

10   gets home.

11          THE COURT:  You are talking about 423; page 423.

12          MS. CORNACHIO:  Yes.  From the time that you woke

13   up.  That's in the middle of the page.  The phone rang.

14   What did you learn.

15          MR. MC CLURE:  I guess the argument is --

16          MS. CORNACHIO:  Excuse me.

17          It's our position that is an admission to her by

18   the defendant.

19          MR. MC CLURE:  Judge, the admission needs to be

20   corroborated.  That's number one, and it's not.  It's not

21   corroborated, because there is no evidence that he took

22   anything.  Obviously, the evidence is the contrary.  He

23   didn't take anything.  And the marijuana and the money was

24   still in Mr. Rivera's pocket.

25          MS. CORNACHIO:  No, Judge.  There was marijuana and

Proceedings

1    money in his pocket.  We don't know how much was there.  He

2    claims he took it.  He could have been lying to her, but

3    that was his intention was to get it.

4              MR. MC CLURE:    He didn't claim he took anything.

5    That's the inference.  He never claimed he took anything.

6              MS. CORNACHIO:    What?

7              I got him.

8              MR. MC CLURE:    I got him for the bud.  That's not

9    I stole bud; I robbed him for the bud.

10             MS. CORNACHIO:    What did you get?  The bud.   I got

11   him.   The bud.

12             MR. MC CLURE:    That could mean a myriad of things,

13   even if you take it on his face.

14             MS. CORNACHIO:    In the context of all the evidence

15   in the case, Judge, and the fact that he's demanding the

16   connect, which we know from testimony is the provider of the

17   drugs; is the distributor of the marijuana.

18             THE COURT:    That he thinks is Aguirre.

19             MS. CORNACHIO:    So.  If he thinks -- He does think

20   it's Aguirre.  And he's there to rob him.

21             THE COURT:    We don't know that.  No, we don't know

22   that.

23             MS. CORNACHIO:    Why is he there?

24             THE COURT:    The evidence doesn't point to a

25   robbery.  It points to something was going to happen for

1        whatever reason.

2               The only issue is the bud.  That she makes a

3        statement, which you say the inference here it's the next

4        day.

5               MS. CORNACHIO:  Same day really.

6               THE COURT:  After she talks to the other people and

7        the phone calls and everything else.  That he's there for

8        the bud.  And that's what she says.

9               MS. CORNACHIO:  That he got him for the bud.  I got

10       Willie.  She asks, "what did you get him for"?  "The bud".

11       Which she explains is marijuana.

12              THE COURT:  Okay.  I'll leave it in, Miss

13       Cornachio, but the jury is going to get a circumstantial

14       evidence charge on this.

15              MS. CORNACHIO:  As far as?

16              THE COURT:  They're getting it on the robbery.  All

17       right.  That's what I'm going to tell them.  They will get a

18       circumstantial evidence on the attempted robbery.  And it's

19       based on page 425, the bud and his statement allegedly about

20       that, if they believe her.

21              All right.  Are there any lessers requested, Mr.

22       McClure?

23              Man one is denied.  There is enough evidence there

24       to get that.

25              MR. MC CLURE:  That was part of what I was

1    discussing with my client.

2             THE COURT:  Are the People going to ask for a

3    lesser?  Man two?  Someone's going to ask for a man two?

4             MS. CORNACHIO:  I think the evidence supports an

5    argument for man two, Judge.

6             THE COURT:  Mr.  McClure, are you going to ask your

7    client about that?

8             MR. MC CLURE:  Yes.  I started discussing it with

9    him when we came in.

10            I can't make a good faith argument that it's not a

11   lesser included.

12            THE COURT:  Man two will be given as to a lesser to

13   man one.

14            MR. MC CLURE:   Yes, Judge.

15            THE COURT:  That's acceptable to the People?

16            MS. CORNACHIO:  Yes.

17            THE COURT:  Anything else?  Any other requests to

18   charge?

19            MS. CORNACHIO:  Do you mind if I stay seated?

20            THE COURT:  No, be seated.  It's fine.

21            MS. CORNACHIO:  There is a charge a lack of real

22   evidence charge that I think this Court has given in the

23   past when the gun is not recovered -- when the gun has not

24   been recovered, therefore it cannot be produced, because of

25   the criminal possession charge.  I can dig it up.

Proceedings

1      THE COURT:  In other words, the People don't need

2   to produce the gun in order to prove the charge.

3      MS. CORNACHIO:  Correct.  We would ask for that.

4      Obviously, the consciousness of guilt that we

5   discussed already.

6      I assume your Honor is going to be giving an

7   identification charge.  We would ask for the one witness

8   plus.

9      MR. MC CLURE:  I'm requested the one witness

10   charge.  There is only one witness that identifies --

11      THE COURT:  I can't hear you.

12      MR. MC CLURE:  I'm requesting that it should be a

13   one witness charge.  There is only one witness that puts a

14   gun in my client's hand.  That's it.  There is one person,

15   and that's Sergio Aguirre.  He's the only person who says

16   that person committed the crime.  It's a one witness case.

17   There are not multiple witnesses.  That's all there is.

18      MS. CORNACHIO:  It's witness plus, Judge.

19      THE COURT:  Anything else?

20      MS. CORNACHIO:  Just the standard.

21      MS. PARRA:  Expert.

22      THE COURT:  Sorry.

23      MS. CORNACHIO:  Just the standard; the expert.

24      THE COURT:  You want no inference charge; correct,

25   Mr.  McClure?

1              MR. MC CLURE:  Yes, Judge.

2              Judge, I think you already indicated that you're to

3      instruct them on jury note taking.  How about jury

4      expertise?

5              THE COURT:  Right.

6              MR. MC CLURE:  You are just asking additional

7      charges other than the standard ones?

8              THE COURT:  Well, anything in particular that you

9      want with this case.

10             MR. MC CLURE:  Obviously, my client didn't testify.

11             You're going to give the credibility charge I'm

12     sure.  You already indicated the circumstantial evidence

13     charge.

14             THE COURT:  It will be -- The circumstantial

15     evidence charge will apply to the attempted robbery count in

16     the felony murder.  Okay.  And I'll explain that to the

17     jury.

18             MR. MC CLURE:  Judge, doesn't the circumstantial

19     evidence -- I don't think you instructed them.  Doesn't that

20     also apply to whether they believe the consciousness of

21     guilt argument of whether --

22             THE COURT:  No.

23             MR. MC CLURE:  -- of whether Mr. Williams had

24     anything to do with that.

25             THE COURT:  No.  The circumstantial evidence charge

Proceedings                           946

1    is going to be limited to the attempted robbery element of

2    the felony murder.

3                MR. MC CLURE:   Indictment is not evidence.

4                THE COURT:   Right.

5                MR. MC CLURE:   Charge on lesser included offense.

6    Now that that's in there.

7                THE COURT:   You want man two to be considered a

8    lesser of man one; right?

9                MR. MC CLURE:   Yes.

10               Presumption of innocence and reasonable doubt.

11   There is nothing other than the general charge, I think,

12   Judge.

13               THE COURT:   Anything else?

14               MS. CORNACHIO:   Do you give the expanded definition

15   of intent?

16               THE COURT:   You want that?

17               MS. CORNACHIO:   Yes, please.

18               THE COURT:   Okay.  All right.

19               In accordance with the Criminal Procedure Law, the

20   Court now advises counsel and defendant that in its final

21   charge the Court intends to instruct the trial jury

22   concerning the specific functions and responsibilities of

23   the Court, counsel, and trial jury.

24               In its final charge the Court will state the

25   fundamental legal principles, the constitutionally

1    safeguards applicable to criminal cases in general,

2    including but not limited to the presumption of the

3    defendant's innocence, the requirement that guilt be proved

4    beyond a reasonable doubt, and that the jury may not in

5    determining the issue of guilt or innocence consider or

6    speculate upon matters relating to sentence or punishment.

7              The Court will instruct the trial jury to the

8    material legal principles relevant to the counts in the

9    indictment and include man two as a lesser of man one.

10             The Court respectfully requests during summations,

11   counsel on both sides confine themselves strictly to a

12   review of the evidence in the case.  In discussion of such

13   inferences or conclusions as counsel may suggest a trial

14   jury may reasonably draw from the evidence or lack of

15   evidence.  The Court will not marshal the evidence.

16             Counsel should refrain from any improper expression

17   of personal belief.  They should not under any circumstances

18   make themselves witnesses in the case; nor bolster, or vouch

19   for the testimony of any witness.

20             Counsel must avoid any form of attack on opposing

21   counsel.  Counsel must refrain from any improper appeal to

22   motion, sympathy, fear or prejudice.  Must a juror appeal to

23   community safety and reputation.

24             For the information of all concerned, the Court

25   will not permit counsel in the summations either directly or

Proceedings

1    indirectly suggest that jurors hold out or otherwise refuse

2    to reason and deliberate together.

3              Any other requests before we break?

4              MR. MC CLURE:  Not that I can think of, Judge.

5              THE COURT:  Miss Cornachio?

6              MS. CORNACHIO:  No, your Honor.

7              THE COURT:  All right, everybody.  I'll see you

8    Monday morning at 9:30.

9              MS. CORNACHIO:  Thank you, your Honor.

10             MR. MC CLURE:  Thank you, Judge.  Have a nice

11   weekend.

12             THE COURT:  You too.  I'll see everybody Monday

13   morning, at 9:30.

14             (Whereupon, at this time the case was adjourned

15   until October 28th, 2013.)

16

17

18

19

20

21

22

23

24

25

ATTORNEY
COPY

Proceedings                                    949

1    SUPERIOR COURT OF THE STATE OF NEW YORK
     COUNTY OF WESTCHESTER
2    ----------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK          Ind. No.
3                                                 1436/12
4                   -against-
5    JAERUE WILLIAMS,
6                              Defendant.
     ----------------------------------------x
7                    October 28th, 2013
8                    White Plains, NY
9    B E F O R E:
                    HONORABLE BARBARA G. ZAMBELLI,
10                  Justice of the County Court
11   APPEARANCES:  (As hereinbefore noted)
     ------------------------------------------------------------
12                  (In open court; jury not present)
13                  THE COURT:  All right.  We're on the record with
14       the continued jury trial on Jaerue Williams.
15                  Are both sides ready?
16                  MS. CORNACHIO:  Yes.
17                  MR. MC CLURE:  Yes.
18                  THE COURT:  We have a juror that called in.  Her
19       husband is having a problem.  I will read to you what my
20       secretary wrote down for me to explain.
21                  Miss Santiago -- This is the note.  It's dated
22       Friday.  As of yesterday, meaning last Thursday, her husband
23       was supposed to have a stent put in his heart.  His heart at
24       this point is beyond a stent.  He will require surgery today
25       or tomorrow.  She's supposed to be here today and talk to

Proceedings                                950

1    us.

2              Let's go off the record.

3              (Whereupon, at this time there was a brief

4    discussion among the Court and counsel off the record.)

5              THE COURT:  We're on the record.

6              With regard to Miss Santiago, who left us a note,

7    is going to be coming in.  If she talks about her husband's

8    surgery, do I need to inquire further, or can we consent to

9    excusing her?

10              Miss Cornachio?

11              MS. CORNACHIO:  Your Honor, the People will consent

12    to excusing her, of course provided the defendant does.

13              MR. MC CLURE:  Yes.  I spoke to Mr.  Williams

14    about that.

15              THE COURT:  Is that acceptable to you, Mr.

16    Williams?

17              THE DEFENDANT:  Yes.

18              THE COURT:  Everyone understands alternate number

19    one is Armaldo Lamdrau, and he will be the 12th juror.

20              MR. MC CLURE:  Yes, Judge.

21              THE COURT:  I'm not going to re-seat the jurors.  I

22    will just tell the back row to slide down one.

23              MS. CORNACHIO:  That's fine.

24              THE COURT:  Let's get Miss Santiago in, please.

25              (Whereupon, at this time Defendant's Exhibit D-1

1    was marked into evidence.)

2              (Whereupon at this time, Miss Santiago, a juror,

3    entered the courtroom.)

4              THE COURT:  Good morning, Miss Santiago.  Sit down

5    and relax.

6              I'm sorry to hear about your husband.  Sit and

7    relax.

8              THE JUROR:  Yes, that's why I'm here.

9              THE COURT:  Tell us what's going on.

10             THE JUROR:  On October 24th, he went for an

11   angiogram.  I don't know the technology.  And I learned that

12   he needs a triple bypass.  Thank God he's in good spirits,

13   and I have faith.  He was supposed to go for surgery

14   yesterday, but -- not yesterday, but today.  We're not

15   hearing anything about the surgery from the surgeon.  So

16   tentatively, it's for tomorrow.  So, just to keep on

17   normalcy, and keep things, I'm willing to serve as a juror.

18   I have confidence that I can do it.  So, if he is going to

19   be operated tomorrow --

20             THE COURT:  You want to be there with him?

21             THE JUROR:  Yes.

22             THE COURT:  We'll excuse you, Miss Santiago.  All

23   right.  We appreciate your service and we wish your husband

24   well.

25             THE JUROR:  Thank you.

1          THE COURT:  I hope all things work out.

2          THE JUROR:  So, this is my last day?

3          THE COURT:  If you want to sit through today --

4   Actually, I have to excuse you now because the jury is going

5   to start deliberating today.

6          THE JUROR:  Very good.  No problem.  I should

7   report to work or --

8          THE COURT:  That's your decision, and between you

9   and your employer.  I can't advise you on that.

10         THE JUROR:  Sometimes they give you the day or not

11  the day.

12         THE COURT:  Thank you, Miss Santiago.

13         (Whereupon, at this time the juror exited the

14  courtroom.)

15         THE COURT:  Is there anything else we need to get

16  on the record before I ask the jury to come in?

17         MR. MC CLURE:  Yes, Judge.

18         THE COURT:  Yes, Mr. McClure.

19         MR. MC CLURE:  As you're aware, the People sent me

20  a fax on October 24th, last Thursday.  I received it by the

21  time I got back in the office that Friday, the 25th.

22  Indicating that on October 23rd, the Port Chester Police

23  Department interrupted an attempted robbery at the residence

24  of Miguel Villafane.  A search of the residence revealed a

25  quantity of marijuana, and two firearms.  More

1    significantly, five .380 caliber PMC cartridges.  And more

2    significantly, the Connecticut driver's license belonged to

3    the deceased in this case.

4         Mr. Villafane was a person on the witness list in

5    this case.  He was at the scene of the crime by all

6    accounts.  He testified in the grand jury to that effect.

7    Based upon that fact, Judge, I believe there is certain

8    relevant probative and material evidence to Mr. Williams

9    defense.

10        I'm going to ask that I be able to bring that

11   evidence in and reopen my case, and bring the evidence in.

12   There is no prejudice to the People.  We just found it out

13   after we adjourned on Tuesday.  I found it out on Friday.

14        Certainly, the fact that a person who is at the

15   scene of the crime, who there is no question about that.  He

16   drove Mr. Rivera to the Greenwich Hospital.  The fact that

17   he had .380 caliber cartridges and the deceased driver's

18   license at his house is relevant and probative.  The People

19   made sure, and I'm sure they're going to argue my client had

20   .380 caliber cartridges at his house.  Well, the same thing

21   goes.

22        It's certainly relevant.  It's certainly probative

23   and material to the issues in this case, and very important

24   to Mr. Williams defense, especially in light of the fact at

25   best the sketchy I.D. that was made by Mr. Aguirre, and all

Proceedings                                                954

1    the other evidence in this case.

2              THE COURT:  Miss Cornachio.

3              MS. CORNACHIO:  Your Honor, just so the record is

4    clear, and I did in fact copy the Court on that fax.

5              I was notified by Port Chester Police that Miguel

6    Villafane had been the victim; the intended victim of a

7    robbery at his home where he lived with another individual.

8    That is not the 16 South Regent street address, and it never

9    was his home.  Just so it's clear.

10             If you recall, he and Bryant Cruz, who did testify

11   here, were very good friends with the deceased.  He had the

12   deceased license, because it had been left in his car.  The

13   fact that he has a license of the deceased is of no moment a

14   year-and-a-half later to this trial and Mr.  Williams.

15             Additionally, the firearms that were recovered from

16   his house are not and could not have fired the bullet that

17   killed Willie Rivera.  The .380 caliber ammunition was

18   amongst other types of ammunition.  Many other types of

19   ammunition.  The ammunition was not Sphere, which is the

20   kind that was found in the defendant's house, and it was not

21   --  This is a year-and-a-half later.  How is that relevant

22   in any way, shape or form to this defendant at this time?

23   If we found it next week, there wouldn't be a reason to

24   reopen the case.  He was not a witness at trial.  He was a

25   witness at the grand jury.  Mr.  McClure had the grand jury

1    minutes since the beginning.

2          The relevance is not there.  There is nothing.

3    What would be asked of him.  It would be mere speculation.

4          THE COURT:  Has he been charged with a crime?

5          MS. CORNACHIO:  He's now being charged with

6    possession of the weapon.

7          And he's also a victim in the robbery.  One of the

8    robbers was in fact apprehended; one of the masked men who

9    invaded his home.  He was interrupted by the police.  They

10   have a search warrant.

11         THE COURT:  Who is accused of the attempted

12   robbery?

13         MS. CORNACHIO:  A man by the name of -- I think

14   Gomez.  Somebody from Yonkers.  Not relating to this.  Not a

15   name we've heard in this case.  Not a name related to this

16   case.

17         The only other thing I can say is I don't know how

18   Mr.  McClure would bring that evidence in at this point.  In

19   what form or what manner, first of all.

20         Second of all, under what grounds.  I think we have

21   to think of it as if it had happened -- The only comparison

22   I can make is what if it had happened two days before we

23   rested.  That still wouldn't be a reason.  It would be

24   irrelevant in every way under Primo and everything else.

25         The fact that he had cartridge shell casings --

Proceedings                                                           1112

```
 1    For Defendant

 2    A-Letter              521

 3    B-Letter              534

 4    C-Letter

 5    D1-Letter                                950

 6    E-Letter

 7

 8    Court's Exhibits

 9    I-Verdict Sheet                          949

10    II-Juror's note                         1065

11    III-Juror's note                        1065

12    IV-Juror's note                         1070

13    V-Juror's note                          1077

14    VI-Juror's note                         1079

15    VII-Juror's note                        1083

16    VIII-Law                                1083

17    IX-Law                                  1083

18    X-Juror's note                          1089

19    XI-Juror's note                         1089

20    XII-Juror's note                        1089

21    XIII-Juror's note                       1091

22    XIV-Juror's note                        1096

23    XV-Juror's note                         1103

24

25
```

ATTORNEY
COPY

1

2  COUNTY COURT OF THE STATE OF NEW YORK
   COUNTY OF WESTCHESTER          PART  BZ
3  -------------------------------------X
   THE PEOPLE OF THE STATE OF NEW YORK,
4                                    :      IND. #
        -against-                          1435/12
5                                    :
   JAERUE WILLIAMS,
6                                    :
                        Defendant.
7  -------------------------------------X
                    Westchester County Courthouse
8                   111 Dr. Martin Luther King Blvd.
                    White Plains, New York, 10601
9                   April 1, 2014

10  BEFORE:
                HON. BARBARA ZAMBELLI,
11              Judge of the County Court

12
   APPEARANCES:
13
14              JANET DIFIORE, ESQ.
                District Attorney
15              111 Dr. Martin Luther King Blvd.
                White Plains, New York 10601
16              BY: WENDY PARRA, ESQ.

17              CHRISTOPHER MCCLURE, ESQ.
                Attorney for Defendant
18

19

20

21

22                  HOWARD BRESHIN,
                    SENIOR COURT REPORTER
23

24

25

26

1

2          THE CLERK:  The People Vs. Jaerue Williams on

3    Indictment 1435 of 2012 on the calendar, page two,

4    number five.

5          MS. PARRA:  Wendy Parra for the People.  The

6    People are ready.  Good morning, your Honor.

7          MR. MCCLURE:  Christopher McClure for Mr.

8    Williams.

9          THE COURT:  Good morning, Mr. McClure.  All

10   right, Ms. Parra, People more for sentence?

11         MS. PARRA:  We do, your Honor.  We

12   provided --

13         MR. MCCLURE:  I am sorry, before sentence I

14   sent that letter.  I wanted to make my oral motion.

15         THE COURT:  Okay.

16         MR. MCCLURE:  Pursuant to CPL Section

17   330.30(1) which is the notice I sent.

18         Judge, the Court is authorized to set aside

19   the evidence on the grounds the evidence is not

20   sufficient to support the conviction.

21         Accepting all of the evidence, your Honor at

22   through the trial, sat through the hearings.  You

23   have the evidence.  I will go through it very briefly

24   because I know your Honor is very familiar with it.

25   We discussed it at length.

26         The verdict came down as Manslaughter in the

Proceedings                    3

First Degree which is an intentional act.  I would

first point out, Judge, even the Murder Two wasn't

charged as an intentional act, it was charged as a

felony murder count and the jury did not come to a

verdict on that.

THE COURT:  I think they were hung up on the

robbery.

MR. MCCLURE:  I agree also, but it wasn't

charged as an intentional act to begin with.

THE COURT:  Meaning the underlying felony

they were hung up on, right?

MR. MCCLURE:  Yes.

MS. PARRA:  Yes.

MR. MCCLURE:  So the insufficiency of the

evidence, even viewing in the light most favorable to

the prosecution, there is no reasonable rational

trier of fact that could have found this was an

intentional act.

In essence, there were two witnesses in this

case that provided the majority of the evidence

against Mr. Williams.  Sergio Guerray (Ph) was the

one eyewitness.  He indicated on direct examination

that the shooter looked nervous, the expression on

his face.  He was jumping in place.  This was all

after the shooting.

                              Proceedings                    4

1

2          He described pulling out the gun, and when he

3    described it he showed your Honor and showed the jury

4    that the gun was never out until after the deceased

5    grabbed the shooter, bear hugged him, he said.

6          He grabbed-- he was in his waistband.  He

7    described it as pulling the gun out this way, using

8    his right hand pulling it straight up and down above

9    his shoulder never really directly pointing it at Mr.

10   Hernandez, I mean the deceased, and then it went off.

11         He didn't see anybody pull a trigger or

12   anything like that.  He said the gun went off and his

13   quote was on cross-examination, the black guy looked

14   shocked.  He looked shocked.  He had a shocked look

15   on his face.  He was bouncing up and down after the

16   shooting.

17         I submit to your Honor that's evidence

18   completely mitigating against the fact that this was

19   an intentional act.  I submit if it was an

20   intentional act there was an intentional shooting,

21   the gun would have came out immediately, would have

22   pointed it at him and shot him.  The gun did not come

23   out at all and is uncontroverted.  There is no

24   evidence to say otherwise until after the deceased

25   grabbed, bear hugged the shooter in this case and

26   even then it was still pointed down, and then the

1          Proceedings              5

2     next witness was Karen Jaramillo (Ph) and she was on

3     the stand quite a long time.

4          She even testified that the allegation that

5     Mr. Williams said to her, "He didn't mean to do it,"

6     he told her it was a mistake.  He told her that

7     Willie attacked him and the gun went off, so there is

8     no evidence whatsoever, your Honor, I submit before

9     the Court that any rational trier of fact could

10    discern or find beyond a reasonable doubt that this

11    was an intentional act, and I know your Honor

12    throughout the trial had some concerns yourself.

13         The jury, you know, found what they found,

14    but I submit to you they could not have found based

15    upon the evidence, even finding it all true in the

16    light most favorable to the People, that this was an

17    intentional act.

18         THE COURT:  My concerns were the top count

19    and they were hung on that, Mr. McClure.

20         MR. MCCLURE:  I understand.

21         THE COURT:  No, let's make the record clear,

22    okay.  The Court almost dismissed the top count and I

23    didn't based on a piece of evidence that was brought

24    to my attention and ended up submitting it to the

25    jury.

26         MR. MCCLURE:  I understand that and I am not

Proceedings                        6

1

2    saying your Honor ruled at any point in time during

3    the trial that was the case, I am saying that was

4    part of my argument in discussions that were had on

5    both my motion after the People's case, that's what I

6    am saying, but the evidence is the evidence, it all

7    came from that witness chair right there.

8              There is nothing in the record, I submit to

9    you, that would indicate that this shooting was an

10   intentional act.  The only two witnesses, the one

11   eyewitness and the witness who indicated that Mr.

12   Williams admitted this to her said so.  She said it

13   was a mistake.  He told me it was a mistake, he

14   didn't mean to do it.  Willie attacked me first.  It

15   was an accident.

16             That was the facts that came from the witness

17   stand based upon the alleged admissions and Mr.

18   Guerrie said the same thing, that after the shooting

19   the shooter looked shocked.

20             I submit you don't look shocked if you

21   intentionally shoot somebody.  You don't jump up in

22   place with a shocked look on your face and then run

23   away.

24             So I submit to you given the evidence that is

25   set forth before you, no rational trier offer fact

26   could have found this was an intentional act.  At

Proceedings                    7

most it was a reckless act if you believe the

testimony, so based upon that, I submit that your

Honor should set aside the verdict of Manslaughter in

the First Degree.

THE COURT:  Ms. Parra.

MS. PARRA:  Your Honor, I would oppose that

and I ask the Court move to sentence as to both

counts of Manslaughter in the First Degree and

Criminal Possession of a Weapon in the Second Degree,

and as the Court indicated, the Court had issue with

the robbery or attempted robbery aspect for the

felony murder of count one.

As for the evidence to support the

Manslaughter in the First Degree and the intent to

cause serious physical injury to another and causes

the death of such person, that being Wilfredo Rivera;

one, Judge, the defendant went to the scene with a

loaded handgun, and what Mr. McClure neglected to

mention was the additional testimony of Karen

Jaramillo that the defendant said to her, I told him

not to do anything stupid.  I am paraphrasing.  I

told him the gun was cocked and ready to go.  That in

and of itself is an intentional act.

When you possess a loaded gun and you bring

it to a scene and then you pull it out and you pull

Proceedings                    8

1

2      the trigger because a gun is not going to go off

3      without the trigger being pulled, that clearly

4      demonstrates the intentional nature and the acts of

5      the defendant.

6              THE COURT:  What about that description of

7      when he pulls his arm up with the gun pointing down,

8      what about that, Ms. Parra?

9              MS. PARRA:  Your Honor, the testimony was

10     that the victim-- the Court can logically conclude

11     that the victim saw the gun.

12             If you recall, the eyewitness testified that

13     the defendant was even pulling up his shirt, and I

14     submit to the Court that is the defendant displaying

15     the gun to the victim saying don't do anything

16     stupid, so to speak, and when the victim sees that

17     and knows what is about to happen, he tries to defend

18     himself by going forward.

19             The defendant is still pulling out the gun in

20     an intentional manner.  This is not something where

21     there is a long struggle over a gun and the gun goes

22     off.  That's not what we have here.  We have the

23     defendant going to that scene to do whatever he was

24     supposed to do.

25             He is displaying the gun.  He is showing it.

26     He is lifting up his shirt in the front.  He has

Proceedings                    9

1

2    indicated to Ms. Jaramillo, I told him not to do

3    anything stupid.  I told him the gun was cocked and

4    ready to shoot, and when he is lunged at by the

5    victim who is trying to prevent or pre-empt a

6    shooting, the defendant is still making that

7    intentional act of going for the gun from his

8    waistband, pulling it up, pulling the trigger and

9    shooting him.  And, your Honor, that falls squarely

10   within the charges that he was convicted of.

11        I ask that the Court deny the defendant's

12   motion to set aside the verdict and we would rely on

13   the record in making that application.

14        THE COURT:  Yes, the jury found here beyond a

15   reasonable doubt this was an intentional act and the

16   inference was easily drawn from that too.  It was not

17   a leap of faith here.  Motion is denied.  All right,

18   let's proceed, please.  He has to be uncuffed to sign

19   an order of protection, please.

20        MS. PARRA:  I prepared it, your Honor.  I

21   left the expiration blank until sentence is handed

22   down.  I also provided to the Court and counsel on

23   the last occasion a written statement by one of the

24   sisters of Wilfredo Rivera, Wendy Hernandez and she

25   would like to read that statement in court today.

26        THE COURT:  Yes, please.  That's fine, sure.

Proceedings                    10

MS. PARRA:  Is now a good time?

THE COURT:  Yes, that's fine.  Sure.

MR. MCCLURE:  As a courtesy, is it okay if he
signs this while the statement is being made?

THE COURT:  Well, it doesn't matter.  Let her
make the statement.  If you would, good morning.
Tell us your name and speak us.

MS. HERNANDEZ:  Wendy Hernandez.

THE COURT:  Spell that?

MS. HERNANDEZ:  W-E-N-D-Y
H-E-R-N-A-N-D-E-Z.

THE COURT:  Go ahead, please.

MS. HERNANDEZ:  My name is Wendy Hernandez.
I am one of Wilfredo's older sisters.

On August 11th, 2012 my little brother
Wilfredo was murdered by the defendant.  The jury
found him guilty of manslaughter and possession of a
criminal weapon.

In my heart I know that he's guilty of taking
his life away regardless of the reason he could have
had.  The lack of respect he holds for the life of
another human being has been clearly shown during the
trial.

Words cannot express the pain and distress
our family and friends have underwent since Willy was

murdered.  The loss of my brother has been very hard

for the family.  Birthdays, Thanksgiving, Christmas

and family gatherings are not the same.  His

laughter, jokes and hugs are truly missed.  Even

though distance separated us two years before he

passed, almost daily video calls maintained us very

close.

The hardest thing for me personally has been

not hearing I love you, his advice and guidance is

missing.  Even though Wilfredo was younger, he was

like a big brother.  He taught me how to ride a bike

and roller skate.  He was braver, stronger and

smarter than me.  He was more than a brother.  We

grew up as best friends.

Not being able to call him kills me inside.

Since he died, I feel like a part of me has died as

well.  Days seem longer as night as well.

He promised my mother, my sister and I on

August 5th that we would see a new Willie when we

returned on our next visit.  That next visit was

later to his wake.  It angers me to know that he did

not hear how much we loved him and how proud we were

before he past.

Having to console my mom as months pass seems

harder.  I hate having to take my kids to see their

Proceedings                12

uncle at the cemetery.  My three year old daughter

remembers the visit we gave him a week before he

passed away.  He always sleeps with a frog he bought

her when we visited the aquarium Connecticut.  It's

hard to understand how a child grieves and how to

explain the passing of someone they feel so close to.

From that day our entire family has been broken.

The financial affect on the family has also

been devastating.  Funeral, transportation and

internment expenses were almost impossible to pay

off.  Loss of wages and traveling with our children

from Texas to New York to attend court have been very

hard.

We know that regardless what happens today,

we will not walk out of this courtroom with any less

pain but will like to know that the defendant would

not be able to hurt another person or family again.

The defendant can ask for any compassion; however, I

ask how much compassion has the defendant considered

the day he shot my brother?

Our family requests that the maximum penalty

is imposed to the defendant.  On behalf of the family

I want to say thank you for this opportunity of

expression.

THE COURT:  Ms. Parra.

```
1                    Proceedings              13
2              MS. PARRA:  Yes, your Honor.  Clearly words
3         cannot -- any words that I have cannot more fully
4         express the loss the whole family has had.  I know
5         the family has been here from the inception of this
6         case.  They came to the trial from Texas.  His father
7         and mother are here as well as his sisters and
8         friends and other family friends.
9              It's poignant to note the statement that
10        Wendy Hernandez said that when she last saw her
11        brother on August 5th he said next time you see me,
12        it will be a new Will, and unfortunately he didn't
13        have that opportunity to prove that to his family.
14        The defendant robbed him of that opportunity,
15        opportunities that the defendant has had over and
16        over.
17             This defendant has basically led a life of
18        crime consistently and violently for over 10 years.
19        The pre-sentence report notes --
20             THE COURT:  How many felony convictions?  The
21        pre-sentence report says five felony convictions.
22        How many does he have?
23             MS. PARRA:  He has five in total.
24             THE COURT:  Are you filing a predicate
25        statement here?
26             MS. PARRA:  Yes.
```

Proceedings                    14

1

2          THE COURT:  You want to hand it up to the

3    Court, please?

4          MS. PARRA:  I provided a copy to counsel.

5          MR. MCCLURE:  I do have a copy, Judge.

6          THE COURT:  Go ahead, please.  He has to be

7    arraigned on it.  You want me to arraign him now or

8    do you want to finish your remarks?

9          Mr. Williams, I have filed with me a

10   predicate felony conviction statement, violent felony

11   conviction statement alleging that you were convicted

12   on May 11th, 2005 in the County Court of Attempted

13   Robbery in the Second Degree and that you were

14   sentenced to 10 years.  Is that you, sir?

15         THE DEFENDANT:  Yes, your Honor.

16         THE COURT:  Do you admit that conviction was

17   lawfully and constitutionally obtained?

18         MR. MCCLURE:  It doesn't say the jail

19   sentence on the predicate, it says it was in the last

20   10 years.  He didn't get 10 years.

21         THE COURT:  I apologize.  He is serving a 10

22   year sentence now.

23         MR. MCCLURE:  Yes.

24         THE COURT:  Sorry.  Okay.  So is that you,

25   sir?

26         THE DEFENDANT:  Yes, your Honor.

Proceedings                    15

1

2          THE COURT:  All right.  You admit that

3  conviction was lawfully and constitutionally

4  obtained?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  All right.  He was convicted of

7  what most recently?

8          MS. PARRA:  Most recently he was convicted of

9  Burglary in the Second Degree for which he is serving

10  the 10 years.

11          THE COURT:  Thank you.  Go ahead, please.

12          MS. PARRA:  The PSR notes the start of the

13  defendant's career as a juvenile delinquent where he

14  was actually sentenced to detention as a juvenile

15  which is not something that is a normal occurrence.

16  Since then, Judge, he has been convicted of five

17  felonies as the Court is aware as part of the

18  Sandoval application that was made by the People.

19  However, I would like to briefly go through it.

20          In February of 2005, which is the felony

21  predicate that is in the predicate statement, the

22  defendant was convicted of Attempted Robbery in the

23  Second Degree.  He received three years state prison

24  on that and that was for robbing victims at

25  knife-point of their money, and in that case he also

26  demanded marijuana, and at one point one of the

Proceedings                    16

1

2    victims was stabbed by the defendant.

3            In March of 2005 he was convicted of Criminal

4    Sale of a Controlled Substance.  He received one to

5    three which was concurrent to the attempted robbery

6    years and that was for dealing drugs to an

7    undercover, specifically cocaine.

8            He goes to state prison.  He gets out.  In

9    2010 on the same day, they were different cases, two

10   different cases, one he was convicted of Attempted

11   Criminal Possession of a Weapon in the Third Degree

12   where he received one and a half to three years in

13   state prison, and that the underlying facts of that

14   case was that he slashed a victim in the face with a

15   knife.  He received a concurrent sentence of one and

16   a half to three on Possession of Stolen Property in

17   the Fourth Degree for possessing some proceeds of a

18   recent burglary in his car.

19           Most recently, the day after he shot and

20   killed Wilfredo Rivera, the defendant burglarized a

21   home in Larchmont.  He went in there in the middle of

22   the night.  The entire family was home.  Young

23   children were sleeping and there was video of that

24   which I had an opportunity to look at where the

25   defendant brazenly went in and out of this home as

26   the family slept and this is one day after he killed

Proceedings                    17

1
2    Wilfredo Rivera.
3              His actions, your Honor, throughout the
4    course of his relatively young life, I believe he is
5    28 or 29 years old, he has been committing crimes
6    consistently.  He has been committing violent crimes
7    and they are all characterized by a brazen violent
8    attitude and it culminates in the end with the
9    defendant taking the life of Wilfredo Rivera.  He is
10   serving 10 years on that Burglary in the Second
11   Degree.
12             The Court is aware of the facts of this case
13   and how he basically ambushed Wilfredo Rivera and
14   shot a young man who was ready to change his life and
15   had no opportunity to do so.
16             For all this, your Honor, he has received
17   chance upon chance upon chance.  He has received
18   minimal state prison sentences.  He received
19   concurrent state prison sentences, and at this point
20   and at this juncture in his life he is undeserving of
21   any leniency from this Court.
22             He has proven it through his acts and he has
23   proven it through his violent brazen attitude.
24   Clearly he is just a career criminal.  This is what
25   he has chosen to do with his life and that is why,
26   your Honor, the People are asking that the maximum

Proceedings                    18

sentence of the Manslaughter in the First Degree, 25

years be imposed consecutive to the 10 years that he

is serving on the burglary conviction.

THE COURT:  Mr. McClure.

MR. MCCLURE:  Judge, to begin with, I

reviewed the pre-sentence report and I waive

additional time, although I did review it the last

time it was on so it has been over 24 hours.

I won't rehash the facts of this case,

incorporate my prior arguments, even the 330

argument.  You sat through the trial.  You heard the

evidence and, your Honor, as you know, he is

currently serving a 10 year sentence.  He pled guilty

to that charge.  I didn't represent him at that time,

but prior to the trial on this case and he maintains

his innocence in this case.

There had been prior offers in this case that

have been going back and forth in this trial.  The

minimum sentence on the manslaughter, he is a violent

predicate, is 10 years and I believe the minimum

sentence on the possession of a weapon is seven

years.

Now, I can't stand here before you in good

faith and say that I request that you sentence him to

the minimum because I don't think that's realistic

Proceedings                    19

and I want to be realistic with your Honor.

My client is here.  He was cooperative during
the trial, didn't cause any problems.  He is here for
sentencing.  His mother has been here throughout the
proceedings, during the trial, for sentencing.  She
was here last time.  He has her support.  I have been
in contact with her since then and in contact with
Mr. Williams since the trial.

Now, I understand that this was an
intentional act that he was convicted of.  You heard
my argument what that was.  This was not a case --
the allegations were he went out with a gun and
pointed it at somebody, shot him and ran away.

It is a mitigating factor in this case the
deceased did initiate the contact.  I submit to you
the gun was by all means in a waistband, it was never
out until the deceased grabbed him, and even then it
wasn't directly pointed at him.  There was no
evidence he pulled the trigger.

I know your Honor indicated there was
inferences that could be drawn and the jury did draw
that this was an intentional act and I understand
that, but there are mitigating factors against that.

There wasn't an ambush like people say.  He
didn't come around the bush guns blazing shooting at

Proceedings                    20

anybody.  That's not what happened.  The gun was

never actually out and even Ms. Jaramillo never saw

the gun.  You heard her testimony.  No one saw a gun

before or after until the first time when it was

allegedly pulled out the waistband and pointing down,

so I submit to your Honor that is a mitigating factor

in this case and should be mitigating in the

sentence.

That was discussed extensively during the

trial and before the trial, so I submit to your Honor

that a sentence of 12 or 13 years in this case

concurrent with the 10 year sentence that he is

already serving would meet the ends of justice, would

satisfy the facts of this case and would be

appropriate in this case, not a sentence of 25 plus

10, 35 years.  That is not a sentence that I submit

to you that meets the crime and the conviction in

this case, the allegations in this case or the

sentence in this case.

There also would be-- obviously there would

be five year post-release supervision, so in essence

it would be a 17, 18 year sentence anyway, so I

submit to your Honor that I respectfully request that

you sentence him to the tune of 12 or 13 years

concurrent with the 10 year sentence he has currently

Proceedings                21

pending on his burglary case and the same on the CPW

all concurrent.  He would be in jail, your Honor, as

you know, 12, 13 years plus there would be five years

post-release supervision and that would meet the ends

of justice in this case and the conviction.

THE COURT:  He has to sign the order of

protection.

MR. MCCLURE:  He will, Judge.

THE COURT:  Thank you, Mr. McClure.

MR. MCCLURE:  I ask that he be given credit

for any time he spent on this case.

THE COURT:  As a sentenced prisoner he

doesn't get that.  I am sure you explained that.

MR. MCCLURE:  He gets credit for any time --

THE COURT:  He wasn't sentenced.

MR. MCCLURE:  That he was not sentenced, yes.

THE COURT:  Mr. Williams, you are given an

opportunity to be heard prior to sentence.  Do you

have something to say?

THE DEFENDANT:  No, your Honor.

THE COURT:  Sorry?

THE DEFENDANT:  I don't, your Honor.

THE COURT:  Look, my job in this case is

pretty clear.  You have a lifetime of violence and my

job is to keep you off the street as long as I

Proceedings                    22

1
2    possibly can so that there no more victims.

3            For the crime of Manslaughter in the First

4    Degree, the sentence of the Court is a determinate

5    sentence of 25 years with five years post-release

6    supervision.

7            The crime of Criminal Possession of a Weapon

8    in the Second Degree, the sentence of the Court is a

9    determinate sentence of 15 years plus five years

10   post-release supervision to run concurrent to the

11   sentence imposed on Manslaughter in the First Degree.

12   The Manslaughter in the First Degree sentence is to

13   be consecutive to the sentence you are presently

14   serving.  The weapons count is concurrent to the

15   manslaughter count.

16           It is ordered for the term of this sentence

17   you be committed to the State Department of

18   Corrections, there to be dealt with according to law.

19           You have 30 days to appeal the sentence of

20   the Court.  If you are unable to afford an attorney,

21   by application to the Appellate Division that Court

22   will determine whether or not you are entitled to

23   assigned counsel.

24           The Court has signed an order of protection

25   running in favor of the folks enumerated in it.

26   That's it.  The fees have to be paid from earnings.

```
 1                          Proceedings              23
 2        Take him away.
 3                  MR. MCCLURE:  I have advised Mr. Williams of
 4        his right to appeal.  I indicate I will file a notice
 5        of appeal on his behalf.
 6                  THE COURT:  Thank you.
 7                  MS. PARRA:  For the record I am putting the
 8        expiration date on the order of protection.  I
 9        believe it's April 1st, 2052.
10                  CERTIFIED TO BE A TRUE AND CORRECT
11                  TRANSCRIPT OF MINUTES IN THIS
                    CASE.
12
13                  HOWARD BRESHIN
14                  SENIOR COURT REPORTER
15
16
17
18
19
20
21
22
23
24
25
26
```